# UNITED STATES DISTRICT COURT
## Southern District of Indiana

Larry Ley, Ronald Vierk, George )
Agapios and Luella Bangura, )    Case No.  1:16-cv-01908-RLY-MJD
)
        Plaintiffs, )
)
v. )
)
The United States, acting by its )
Drug Enforcement Administration, )
Gary L. Whisenand, the City of )
Carmel, and Aaron Dietz, )
)
        Defendants. )

---

## PLAINTIFFS LARRY LEY'S AND GEORGE AGAPIOS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

James R. Fisher
MILLER & FISHER, LLC
8900 Keystone Crossing, Suite 1080
Indianapolis, Indiana  46240
(317) 536-7570
fisher@millerfisher.com

May 9, 2018

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF MATERIAL FACTS IN DISPUTE .......................................................... 1

    1. The Formation of DORN ........................................................................................ 1

    2. Medical Staff's Specialty Qualifications ................................................................ 2

    3. Suboxone ............................................................................................................... 3

    4. The DORN Program. ............................................................................................. 5

    5. Regulatory Compliance Inspections and Communications ..................................... 8

    6. The Conspirators' Roles ......................................................................................... 9

    7. The Initial Investigation Found Insufficient Evidence to Prosecute .............................. 11

    8. Permission is Obtained for Undercover Operations ...................................................... 12

    9. The Undercover Results Find No Evidence of A Crime .............................................. 12

    10. Whisenand Admissions ........................................................................................... 18

    11. Outcome of Criminal Proceedings ........................................................................... 21

STATEMENT OF ISSUES.................................................................................................. 22

ARGUMENT ..................................................................................................................... 22

    1. Elements of the criminal offenses charged .............................................................. 23

    2. Plaintiffs' Claims .................................................................................................. 24

    3. The DORN Probable Cause Affidavit Contains Multiple False Statements. .................. 31

    4. Material Omissions from the Probable Cause Affidavit. ............................................. 36

5.  The DEA's "Expert" opinions lack credibility, because Defendants withheld important information from them .................................................................................................. 40

6.  Whisenand omitted exculpatory evidence from their consulting experts from the Probable Cause Affidavit ............................................................................................................... 42

7.  A jury is entitled to find there was no probable cause. ............................................... 46

8.  Defendants' case examples of evidence of intent are dissimilar .................................. 46

9.  The jury is entitled to find actual malice .................................................................... 49

10. Ley's settlement of the forfeiture action is not an admission of probable cause to arrest or prosecute for crimes. ................................................................................................... 65

11. Facts and Arguments Unique to Plaintiff George Agapios, M.D ................................. 66

12. Facts and Arguments Unique to Eric W. Ley ............................................................. 68

13. Facts and Argument Unique to Andrew Dollard ........................................................ 71

CONCLUSION ..................................................................................................................... 73

CERTIFICATE OF SERVICE .............................................................................................. 74

# TABLE OF AUTHORITIES

**Cases**

*Abbot v. Sangamon County,* 705 F.3d 706(7th Cir. 2013)............................................................ 23

*Acevedo v. Canterbury,* 457 F.3d 721 (7th Cir. 2006)................................................................. 26

*Alarcon v. State,* 573 N.E.2d 477 (Ind. Ct. App. 1991)......................................................... 23, 49

*Alexander v. United States,* 721 F.3d 418 (7th Cir. 2013)......................................................... 25

*Betker v. Gomez,* 692 F.3d 854 (7th Cir. 2012) .................................................................... 30, 31

*Branson v. Newburgh Police Department,* 849 F. Supp. 2d 802 (S.D. Ind. 2011)...................... 31

*Bunch v. United States,* 880 F.3d 938, 941 (7th Cir. 2018) ........................................................ 24

*Chalifant v. Lods,* 994 N.E.2d 740 (Ind. Ct. App. 2013) ............................................................ 24

*Chelios v. Heavner,* 520 F.3d 678, (7th Cir. 2008).................................................................... 24

*Conwell v. Beatty,* 667 N.E.2d 768 .......................................................................................... 29

*Crosson v. Berry,* 829 N.E.2d 184 (Ind. Ct. App. 2005) ............................................................ 46

*Davis v. Zirklebach,* 149 F.3d 614 (7th Cir. 1997) ............................................................... 61, 62

*Dixon v. Wallowa County,* 336 F.3d 1013 (9th Cir. 2003) ......................................................... 62

*Donovan v. Hoosier Park, LLC,* 84 N.E.3d 1198 (Ind. Ct. App. 2017) ...................................... 25

*Eversole v. Steele,* 59 F.3d 710 (7th Cir. 1995) ........................................................................ 28

*F.W. Woolworth Co., v. Anderson,* 471 N.E.2d 1249 (Ind. Ct. App. 1985) .......................... 25, 49

*Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010) ............................................................................. 29

*Garrett v. City of Bloomington,* 478 N.E.2d 89 (Ind. Ct. App. 1985) ........................................ 24

*Gerth v. State,* 51 N.E.3d 368 (Ind. Ct. App. 2016) ............................................................. 36, 37

*Golden Years Homestead, Inc. v. Buckland,* 557 F.3d 457 (7th Cir. 2009).................................. 49

*Hart v. Mannina,* 798 F.3d 578 (7th Cir. 2015)........................................................................ 30

*Hudkins v. City of Indianapolis,* 2015 U.S. Dist. LEXIS 103039, .......................................... 65, 66

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ................................................ 26

*Jong Hi Bek v. U.S.,* 2008 U.S. Dist. LEXIS 96284 .................................................... 48

*Julian v. Hanna,* 732 F.3d 842 (7th Cir. 2013).......................................................... 25

*Manuel v. City of Joliet,* 137 S. Ct. 911 (2017) ........................................................ 25

*McGreal v. Ostrov,* 368 F.3d 657 (7th Cir. 2004) ...................................................... 28

*Olson v. Tyler,* 771 F.2d 277 (7th Cir. 1985)......................................................... 29, 30

*Peoples Bank & Trust Co. v. Stock*, 392 N.E.2d 505 (Ind. Ct. App. 1979) ................................. 50

*Piggle v. Riggle,* 548 F.Supp.2d 652 (N.D.Ind 2008).................................................... 26

*Pontius v. Kimble,* 104 N.E. 981, 56 Ind. App. 144, 145-46 (1914) ...................................... 50

*Pribble v. Town of Winona Lake,* 2007 U.S. Dist. LEXIS 28517 at *9....................................... 46

*Rasho v. Elyea,* 856 F.3d 469 (7th Cir. 2017).......................................................... 26

*Smith v. United States,* 860 F.3d 995 (7th Cir. 2017) ................................................... 24

*Sturm v. City of Indianapolis,* 2016 U.S. Dist. LEXIS 65144 (S.D. Ind.) ................................... 23

*Tibbett v. McPherson,* 5 F. Supp. 3d 989, (S.D. Ind. 2014) ............................................ 46, 61

*U. S. v. Rosenberg,* 585 F.3d 355 (7th Cir. 2009)...................................................... 48

*U.S. v. Williams* 737 F.2d 594 (7th Cir. 1984).......................................................... 50

*United States v. Chube,* 538 F.3d 693 (7th Cir. 2007).................................................. 47

*United States v. Kohli,* 847 F.3d 483 (7th Cir. 2016) .................................................. 5, 48

*United States v. Lyons,* 73 F.3d 777 (7th Cir. 2013).................................................... 27

*United States v. Moore,* 423 U.S. 122 (1975).......................................................... 47

*United States v. Pellmann*, 668 F.3d 918 (7th Cir. 2012)............................................... 47

*United States v. Robinson,* 546 F.3d 884 (7th Cir. 2008) ............................................... 36

*Wadkins v. Arnold,* 214 F.3d 535 (4th Cir. 2000) ........................................................ 62

*Wells v. Coker,* 707 F.3d 756 (7th Cir. 2013) ............................................................... 66

*Wheeler v. Lawson,* 539 F.3d 629 (7th Cir. 2008) ........................................................ 46

*Whitlock v. Brown,* 596 F.3d 406 (7th Cir. 2010) .................................................... 29, 36

*Williams v. City of Chicago,* 733 F.3d 749 (7th Cir. 2013) ............................... 28, 49, 61

*Wilson v. Russo,* 212 F.3d 781 (3rd Cir. 2000) ........................................................... 30

**Statutes**

21 U.S.C § 841(a)(1) ...................................................................................................... 46

28 U.S.C. § 1346(b)(1). .................................................................................................. 24

28 U.S.C. §2680( ........................................................................................................... 24

**Other Authorities**

844 IAC 5-4-1 ...................................................................................................... 32, 33, 67

856 IAC 2-6-3 § 3 (a) ..................................................................................................... 69

**Rules**

Ind. Code § 16-42-19-2 ................................................................................................... 23

Indiana Code § 25-1-9-4. .......................................................................................... 52, 53

Ind. Code § 35-41-5-2 ............................................................................................... 23, 24

Ind. Code § 35-45-1-3 ..................................................................................................... 46

Ind. Code § 35-45-6-2 ............................................................................................... 23, 24

Ind. Code § 35-48-4-2 ..................................................................................................... 23

Ind. Code § 36-8-3-3(g) .................................................................................................. 28

# INTRODUCTION

"[O]pioids are currently our most emergent challenge….
                           ***
Addiction has swept into every community and is flooding every
court – and not just in Indiana but across our country.
                           ***
People often ask me the same question they are asking you:  what
can we do about this crisis?  I have only one answer:  together, we
must do everything."

Loretta Rush, Co-Chair, National Judicial Opioid Task Force
Chief Justice of the Indiana Supreme Court
State of Judiciary Speech to the Indiana General Assembly, January 10, 2018

## STATEMENT OF MATERIAL FACTS IN DISPUTE

### 1.  The Formation of DORN

Plaintiff Dr. Larry Ley graduated from medical school in 1971.  (Ley Dep. p. 9:21-24).

Dr. Ley was Board Certified in addiction medicine by the American Society of Addiction

Medicine ("ASAM"), which is the Medical Board for that specialty.  (Ley Dep. p. 12:20 – p.

13:1, p. 14:5-8). Board Certification required 2000 hours of clinical experience, passing Board

exams, and recommendations by previously certified addiction medicine physicians.  (Ley Dep.

p. 13:2-8). Dr. Ley has been active in ASAM since 2002, and has maintained his certification

status. (Ley Trial Transcript p. 1207:12 – p. 1208:18).

Dr. Ley started Living Life Clean in 2002-2003.  (Ley Dep. p. 13:9-23).  Living Life

Clean was initially established to provide medication-assisted detoxification from alcohol.  (Ley

Dep. p. 13:9-15).  Living Life Clean had four locations: Richmond, Noblesville, Muncie, and

Kokomo. (Ley Dep. p. 14:9-13).  Court Probation Departments in each of these counties were

the primary source of referrals to the Living Life Clean programs.  (Ley Dep. p. 15:16-22).

Between 2003 and 2004, more and more of the referrals to Living Life Clean presented with opioid addiction issues, in addition to alcohol.  (Dollard Dep. p. 18:2-17).  Because of Dr. Ley's observation of the growing opioid problem, and the obvious need for more opioid addiction treatment options and qualified addiction-trained physicians, Dr. Ley refocused his practice to specialize in the medication-assisted treatment of opioid addiction.  (Ley Dep. p. 15:16-22, p. 17:16 – p. 18:7).  This practice became the Drug and Opiate Recovery Network. (Ley Dep. p. 16:16-22).

2. Medical Staff's Specialty Qualifications

At the time of the arrests, there were three doctors who made up the clinic medical staff at DORN, in addition to Dr. Ley.  Ley Dep. p. 20:8 – p. 21:3). Dr. Ley performed all of the initial examinations of patients.  (Ley Dep. p. 18:11-25).

After the initial diagnosis and treatment plan were established by Dr. Ley, Dr. Ley would assign each patient to report monthly to follow-up clinics closer to the patient's work or residence.  (Ley Dep. p. 18:11-21, p. 19:1-9).  The satellite clinic doctors (Agapios, Vierk and Bangura) would supervise the incremental reductions in the medication dosage, review and deal with abnormal INSPECT reports, review and deal with urine drug screen results, treat patient comorbidities (anxiety, depression, insomnia, nausea, for example) and address patient treatment questions.  (Agapios Dep. p. 21:13 – p. 22:4).

All of the DORN physicians were properly licensed by both the State of Indiana and by the DEA for the prescription of narcotics.  (Whisenand Dep. p. 75:16-23).  Each DORN doctor had obtained certification from the Substance Abuse and Mental Health Services Administration ("SAMHSA") to treat up to 100 patients at a time for addiction in an office setting utilizing an FDA approved addiction treatment medication.  Buprenorphine ("Suboxone") was the

medication approved by the FDA and DEA for office-based addiction treatment. (Agapios Dep. p. 23:10 – p. 25:17).

    3.  <u>Suboxone</u>.

In September of 2004, the U.S. Justice Department's National Drug Intelligence Center issued a report concerning Suboxone. In relevant part, it found:

> Within the past two years Buprenorphine – a Schedule III drug – has been made available for use in opiate addiction therapy. Two formulations of the drug are used in such therapy. Subutex, which is pure Buprenorphine, is designed to be used in the initial stages of addiction treatment. Suboxone, which contains an anti-abuse component, is designed to be used in the maintenance stage of treatment. Both block the effects of opiates while reducing opiate cravings and easing withdrawal symptoms. Buprenorphine is the only opiate addiction therapy drug that can be prescribed in a physician's office; others must be dispensed in a clinic. This method of distribution is advantageous to many opiate addiction therapy patients because it is more convenient and less stigmatizing than clinic-based therapy, which typically involves Methadone.

P. 1-2.

> In fact, Suboxone was designed specifically to meet FDA requirements for a more diversion proof drug for use in opiate addiction therapy and is available only in the United States. The Naloxone contained in Suboxone guards against abuse – if an abuser crushes and injects or snorts the Suboxone tablet, the Naloxone in it precipitates withdrawal symptoms. Naloxone (Narcan) reverses the effects of opiates.

P. 3.

> The drug . . . causes no significant impairment of cognitive or motor skills. Like Methadone, Buprenorphine reduces cravings for heroin and other opiates and reduces withdrawal symptoms, thus helping addictive individuals to stop abusing opiates. Also like Methadone, Buprenorphine blocks the effects of heroin by binding to the same opiate receptors as heroin; consequently, opiate addicts who use Buprenorphine are not able to get a high from heroin.

P. 4.

> Buprenorphine also has a "ceiling effect" whereby increased doses
> of the drug do not produce increased effects after a certain point, or
> ceiling. In fact, high doses of the drug can actually precipitate
> withdrawal symptoms in opiate addicted individuals. Because of
> this ceiling effect, Buprenorphine is less susceptible to abuse than
> other opiates; . . . .

P. 4.

> While it is possible to overdose on Buprenorphine, it is safer than
> Methadone because of its ceiling effect and decreased degree of
> respiratory depression. Also, because of the various safeguards in
> place, Buprenorphine is more difficult to divert than Methadone.

P. 5; Designation of Evidence, Ex. 1.

A Surgeon General's report "Facing Addiction in America" was issued in 2016 by the

U.S. Department of Health & Human Services and by the Substance Abuse and Mental Health

Services Administration. The Surgeon General's report had the following information

concerning Buprenorphine (Suboxone).

> Widening access to highly effective medications for treating opioid
> addiction – Methadone, Buprenorphine, and now Trexone – has
> been identified by United States Public Health Authorities as an
> essential part of tackling America's current prescription opioid and
> heroin crisis.

P. ES-9.

> However, lack of physician availability to prescribe Buprenorphine
> has been a significant limitation on access to this effective
> medication. Although approximately 435,000 primary care
> physicians practice medicine in the United States, only slightly
> more than 30,000 have a Buprenorphine waiver, and only about
> half of those are actually treating opioid use disorders. To address
> this limitation and narrow the treatment gap, a final rule was
> published on July 8, 2016, expanding access to MAT by allowing
> eligible practitioners to request approval to treat up to 275 patients.
> Additionally, on July 22, 2016, the Comprehensible Addiction and
> Recovery Act ("CARA") was signed into law. CARA temporarily
> expands eligibility to prescribe Buprenorphine based drugs for
> MAT for substance use disorders to qualifying nurse practitioners
> and physician assistants through October 1, 2021.

P. 4-23 to 4-24, Designation of Evidence Ex. 2.

The Seventh Circuit has specifically recognized that treating narcotic addiction is a legitimate medical purpose of Suboxone. *United States v. Kohli,* 847 F.3d 483, 494, n.2 (7th Cir. 2016)("certain controlled narcotics are commonly used to <u>treat</u> addiction. See *Drugs.com* https://www.drugs.com/suboxone.html;")

4. <u>The DORN Program</u>.

DORN treated only opioid addicts. It did not accept patients unless they had an addiction history. (Ley Dep. p. 40:19 – p. 41:4). In order to be admitted into the program, each patient had to provide a detailed medical history focused upon the patient's drug use, including both legally prescribed, and illegally obtained, drugs. (Whisenand Dep. p. 28:7-22; Ex. 81).

A copy of the pledge is Exhibit "3" in the Designation of Evidence. In it, each patient agrees to abide by the DORN program rules, including (1) take the medication only in the dosage and on the frequency schedule established by the program, (2) take no other legally prescribed or illegal narcotic drugs, or any drug of abuse, (3) enroll in an appropriate addiction counseling program and regularly attend counseling sessions, (4) seek regular employment, (5) obtain and provide to DORN any relevant and requested medical reports from other providers, and (6) agree to submit to urine drug testing screens as frequently as requested by DORN staff.

Dr. Ley personally examined each new patient in a 2-3 hour initial office visit, and started them on an individually tailored Suboxone schedule. Details of the DORN program and protocols are set out in Dr. Ley's Affidavit. (Design. of Evid., Ex. 4). All of the patients were placed on a taper schedule leading to the elimination of medication. (Whisenand Dep. p. 37:15-24).

Suboxone detoxification removes the physical dependency, but it does not deal with the cravings that are the core of addiction. Counseling addresses the cravings and behavioral issues of addiction. (Ley Trial Transcript p. 1062:22 – p. 1063:10). For that reason, the DORN program required each patient to undergo addiction counseling. (Ley Trial Transcript p. 1260:8-11). A reasonably priced counseling option was recommended for patients who could not otherwise obtain such services. Laura Linville, a qualified, licensed therapist, provided the counseling. (Whisenand Dep. p. 184:23 – p. 185:7). Patients who consistently failed to attend counseling were warned they could be terminated from the program. (Design. of Evid., Ex. 5). DORN required verification of attendance from the counseling service. (Design. of Evid., Ex. 5).

Patients were given access to the private cell phone numbers of Dr. Ley, and of the office manager for each of the satellite offices. (Whisenand Dep. p. 84:5-10). Dr. Ley was available 24/7 to talk with patients experiencing problems or having questions. He regularly answered 100 calls a day from patients. (Ley Trial Transcript p. 1219:8 - p. 1220:8).

A positive urine drug screen for illegal drugs or drugs from some source other than the DORN-prescribed therapeutic dose of Suboxone, could result in expulsion from the program. Whisenand's review of DORN patient records confirmed that "many patients" were discharged for failed drug screens. (Ex. 145).

Dr. Norman Stanley Miller testified as an expert witness for Dr. Ley at his trial. Dr. Miller is both a medical doctor and a lawyer. (Miller Trial Testimony p. 1053:3-5). He is Board Certified in Psychiatry and Neurology. (Miller Trial Testimony p. 1054:3-20). He has been practicing addiction medicine since 1979. (Miller Trial Testimony p. 1056:8-12).

Dr. Miller examined Dr. Ley's program. He reviewed all of the records of the undercover agents, including their tapes. He reviewed more than 100 medical records of legitimate DORN patients, other than the undercover agents. He reviewed the statements of doctors, and staff. He reviewed the depositions of Dr. King and Dr. Chambers. He examined the protocols utilized by DORN, and he reviewed the Probable Cause Affidavit. (Miller Trial Testimony p. 1070:22 – p. 1072:18.

Dr. Miller testified that the DORN procedures were appropriate for the diagnosis of the undercover officers reported drug use history and symptoms. (Miller Trial Testimony p. 1080:6-17). The treatment provided by DORN to the undercover officers was the appropriate treatment, given the symptoms and history and the reported medication results at the follow-up visits. (Miller Trial Testimony p. 1081:19-23). The taper schedules established for each of the undercover officers constituted the appropriate treatment plans for patients with the reported history and symptoms. (Miller Trial Testimony p. 1082:6-22). The DORN treatment program and the execution of that program met the "standard of care" in the medical field for the use of Suboxone in addiction treatment. (Miller Trial Testimony p. 1090:19 – p. 1091:1).

The appropriate and required "focused exam" for diagnostic purposes was not a physical examination, but was a mental status exam. This was appropriately performed by Dr. Ley's questioning of program applicants and by the history given in their written self-assessments. (Miller Trial Testimony p. 1098:18 – p. 1099:13).

Dr. Miller strongly disagreed with Dr. Chambers' testimony, in which Dr. Chambers claimed that it was impossible to diagnose a narcotic addiction appropriate for detoxification treatment, based solely upon a patient reporting the prolonged daily use of heroin or excessive amount of other opioids. Dr. Miller summarized Dr. Chambers' theories as follows:

> I don't think he understands narcotic addiction. I don't think he
> understands opiate induced hyperalgesia. I don't think he treats
> reality. . . . He didn't even know how to diagnose addiction. He
> said it is a complex, very complex, time consuming diagnosis. I
> can do it in five seconds. If someone gets in an accident and has a
> blood alcohol level of .3, their alcoholic until proven otherwise
> period.

Miller Trial Testimony p. 1093:4-20.

Dr. Miller viewed the taped interactions between Dr. Ley and the undercover officers at

their initial evaluation and diagnosis, and concluded it showed appropriate and common

addiction treatment.

> Well, first of all, I thought Dr. Ley understood addiction and I
> thought he gave them a good education on addiction and he said
> very few things that I would disagree with. And I think he covered
> the waterfront. And I agree with his statement about methadone. I
> think methadone is a dangerous medication. It doesn't really play
> the role in my opinion in addiction treatment after evaluating
> many, many patients on methadone. So I think his general
> statements were helpful, were within the standard of care, were
> current addiction medicine, and were informative in the kinds of
> things that we talk about in addiction treatment programs.

Miller Trial Testimony p. 1094:1-11.

     5.   <u>Regulatory Compliance Inspections and Communications</u>.

Both the Indiana Medical Licensing Board and the Federal DEA had the right to inspect

the DORN operations for regulatory compliance. Prior to opening the investigation that resulted

in these arrests, the DEA had reviewed the reports of eight such prior inspections of DORN

clinics. (Dep. Exs. 159, 160, 161, 162, 163, 164, 165; Design. of Evid., Ex. 6; Whisenand Dep.

p. 11:14-19, p. 19:7-11, p. 188:17 – p. 189:3, p. 191:20-23, p. 192:20-23, p. 194:14-17, p. 198:20

– p. 199:22, p. 201:11-17, p. 202:5 – p. 203:14).

The State Medical Licensing Board and the Indiana Attorney General's Office conducted

inspections of DORN in 2007, and in 2012. The DEA conducted on-site inspections of DORN

clinics in 2005, 2007, 2008, twice in 2012, and 2013. The DEA inspection reports provided to DORN did not recommend any substantive changes in the DORN examination, diagnostic or prescribing protocols or practices. (*See,* Dep. Exs. 159, 160, 161, 162, 163, 164, 165, 166; Design. of Evid., Ex. 6).

In a phone call to Whisenand's DEA office on March 14, 2014, four months before the arrests, DORN requested that DEA make an on-site visit to DORN to confirm that DORN's protocols were in full compliance with Indiana's new narcotic controlled substance regulations, which became effective in March of 2014. (Design. of Evid., Ex. 7; Dep. Ex. 174). The DEA refused. DORN requested DEA's guidance and interpretation of the requirements. The DEA refused. (Whisenand Dep. p. 222:4 – p. 227:13, p. 232:18-24). They wanted to "protect" their investigation by not answering DORN's questions. (Whisenand Dep. p. 117:5-23).

Patients paid $300 for the initial exam and induction into the program. After the initial fee, patients paid $40 per week. (Whisenand Dep. p. 64:6 – p. 66:8). The program price did not change, regardless of the number of physician contacts, or the amount of medication prescribed. Patients did not pay DORN anything for prescriptions. (Dr. Ley Aff. ¶ 22; Design. of Evid., Ex. 4).

The Medical Licensing Board investigated DORN's pricing policy and contracts to determine whether DORN's fee structure constituted paying for prescriptions. It found that the fees charged were fees for the program, not for prescriptions, and that the operation of the clinics complied with all legal requirements. This Board finding was attached to a DEA investigation report in November of 2013. (Dep. Ex. 159; Design. of Evid., Ex. 6).

      6. The Conspirators' Roles.

Gary Whisenand ("Whisenand") was a "Diversion Investigator" with the Drug Enforcement Administrator ("DEA"). (Whisenand Dep. p. 8:14-19). A "Diversion Investigator" conducts investigations involving controlled pharmaceuticals that potentially or actually end up on the illicit market. (Whisenand Dep. p. 10:13-19). Whisenand was the lead agent in charge of the DORN investigation (Whisenand Dep. p. 50:21-24), and the primary drafter of the Probable Cause Affidavit. (Miksha Dep. p. 46:19 – p. 47:1). Whisenand and Wichern "built" the Probable Cause Affidavit. (Whisenand Dep. p. 69:10-14).

Whisenand's direct supervisor was Dennis Wichern ("Wichern"). (Whisenand p. 8:20-24). Wichern was at all relevant times a "Special Agent" with the DEA. (Whisenand Dep. p. 9:7-9). The DORN investigation was a joint operation between the DEA and the Hamilton/Boone County Drug Task Force ("DTF"). (*See* Probable Cause Affidavit; Dep. Ex. D; Design. of Evidence, Ex. 8).

The Hamilton/Boone County DTF is a separate entity operating under the control of the Carmel Police Department ("CPD"). (Dietz Dep. p. 11:17 – p. 12:24). At all relevant times, Aaron Dietz ("Dietz") was a Major in the CPD, and the Director of the DTF. (Dietz Dep. p. 9:13-25). The Board Members of the DTF consist of the Sheriffs of the two counties, the Police Chiefs of Carmel, Fishers, Lebanon, and Zionsville, and representatives of the Hamilton County and Boone County Prosecutors' Offices. (Dietz Dep. p. 84:20 – p. 85:5).

Dietz assigned the DORN investigation to Officer Marc Klein ("Klein"). (Dietz Dep. p. 17:18). Klein and Dietz met with DEA agents to initiate a joint investigation of DORN. Dietz directed Klein, and other subordinates he had assigned to the investigation, to be the contacts between the CPD and the DEA in connection with this operation. The Carmel Police Officers assigned by Dietz to the investigation received day-to-day instruction from Whisenand at the

DEA, and briefed Dietz.  (Dietz Dep. p. 20:8-18).  Whisenand had periodic face-to-face briefings with Dietz.  (Dietz Dep. p. 21:12 – p. 22:5).

      7.   The Initial Investigation Found Insufficient Evidence to Prosecute.

Based upon the initial investigation, Prosecutor Mishka and Special Agent Whisenand concluded that *they did not have evidence sufficient to initiate a prosecution.*

The investigation revealed no basis for filing criminal charges in connection with the death of Steven Mullinex.  (Whisenand Dep. p. 24:16-20).  The investigation did not find a single DORN patient who was not actually an opiate addict.  (Whisenand Dep. p. 48:6-9).  All of the DORN physicians were qualified physicians, licensed to issue Suboxone prescriptions for opiate addiction.  (Whisenand Dep. p. 75:16-23).  The reported rumors from anonymous addicts that Dr. Ley met with patients outside of the clinic setting could not be verified.  (Whisenand Dep. p. 83:23 – p. 84:4).

The DEA looked for evidence of "structuring" in the clinics' cash transactions, but found none.  (Whisenand Dep. p. 161:12-20).  Not even a single DORN patient was ever hospitalized or treated for an overdose of Suboxone.  (Whisenand Dep. p. 163:15-18).  No DORN patient was prescribed anything more than a therapeutic dose level of Suboxone.  (Whisenand Dep. p. 167:16-19).  No DORN patients were found for whom Suboxone treatment was not medically appropriate.  (Whisenand Dep. p. 167:20 – p. 168:1).

The DEA inspection of Dr. Agapios' clinic in 2012 found that no criminal activity was observed, suspected, or reported.  (Whisenand Dep. p. 191:20-192:18).  A 2012 investigation of Dr. Vierk's clinic by the DEA concluded that no criminal activities were observed or suspected.  (Whisenand Dep. p. 192:20-193:17).  In 2013, the DEA investigated Dr. Bangura's clinic.  The

report found that there was no evidence of any diversion of Suboxone from Dr. Bangura's clinic operations. (Whisenand Dep. p. 198:20 – p. 199-22).

Not a single DORN patient was found who requested to see a DORN doctor during the course of his treatment and was unable to do so. (Whisenand Dep. p. 283:16-21). The investigation found that it was not possible for anyone to obtain a prescription from DORN for Suboxone without first following the protocols necessary to enter the DORN program. (Whisenand Dep. p. 283:22 – p. 284:2).

       8.   <u>Permission is Obtained for Undercover Operations</u>.

Because of the absence of evidence of a crime, Whisenand was told by Miksha that he would need to obtain evidence from undercover operatives if he was going to justify a prosecution. (Miksha Dep. p. 30:10 – p. 31:3). Because of DEA policy and regulations, it would be necessary for Whisenand to obtain approval from a Federal Magistrate to utilize undercover operatives posing as patients at the DORN clinics. (Whisenand Dep. p. 176:3-8). *The required showing to obtain such authorization was to affirmatively swear, under oath, that without using undercover agents to find new evidence of a crime, there was insufficient information to go forward with the prosecution.* In order to secure the permission to use undercover agents, Whisenand presented an affidavit to Magistrate Judge Baker. (Whisenand Dep. p. 175:23 – p. 176:16). In his affidavit, Whisenand swore that undercover agents would be "the only way in which to confirm whether controlled substances are being illegally distributed. . ." and that undercover agents "are necessary to confirm what actually happens." (Whisenand Dep. p. 177:14-179:5).

       9.   <u>The Undercover Results Find No Evidence of A Crime</u>.

On February 13, 2014, Magistrate Judge Baker authorized Whisenand to conduct an undercover operation of DORN. The undercover agents ("UC") entered the program on various dates between March 25, 2014 and April 10, 2014. (PCA, ¶¶ 104-107). To get into the DORN program, each UC had to claim to be an opiate addict seeking treatment to get clean. (Whisenand Dep. p. 169:5 – p. 170:9).

Each of the seven undercover officers met with Dr. Ley in groups of two or three new patients, for a two hour initial face-to-face meeting. (Whisenand Dep. p. 171:11-14). One hour of that session consisted of Dr. Ley's description and discussion of addiction, and of the DORN program's patient requirements and expectations, and one hour of each session consisted of patients answering Dr. Ley's questions concerning details of each patient's current drug use and drug use history. (PCA, ¶¶ 104(a), 105(a), 106(a), 107(a)). All of the undercover officers were offered two alternative forms of treatment: Suboxone or non-narcotic treatment with Vivitrol. (Whisenand Dep. p. 173:4-16). Each of the undercover officer's Suboxone prescriptions were different and individual, based upon the individual drug use histories each undercover officer had presented. (Whisenand Dep. p. 172:16-22).

Each of the undercover officers was required to sign a "pledge," which acknowledged the obligations they agreed to accept as a condition of entering into the DORN program. (Whisenand Dep. p. 181:1 – p. 182:15). Each of the undercover officers was required to authorize DORN to obtain urine drug screen tests on demand. (Whisenand Dep. p. 171:25 – p. 172:2). They were each given a written schedule showing the expected taper periods at which Suboxone dosage reductions would occur. (Whisenand Dep. p. 182:10-15). The taper schedules each ended with complete weaning from Suboxone at the conclusion of detoxification. (Whisenand Dep. p. 36:4-22). The prescription to each of the undercover officers was in a

13

therapeutic dose appropriate for the drug history provided by the undercover officer to DORN. (Whisenand Dep. p. 172:9-15). Each of the taper schedules provided to the undercover officers was appropriate medication-assisted treatment for drug addiction. (Whisenand Dep. p. 56:9-12).

Each of the undercover officers was assigned to one of the four satellite offices for follow up treatment and compliance monitoring. Each of the undercover officers made three visits to the assigned satellite office. (PCA, ¶¶ 108-128). On each visit, the undercover officer observed and documented that urine drug screening was being performed on-site. (Whisenand Dep. p. 91:15 – p. 92:12). Before each visit, the undercover officer's INSPECT report was checked for prohibited additional prescriptions. (Whisenand Dep. p. 171:18-24). At each visit, each undercover officer was asked if he or she was experiencing any problems with the Suboxone dose, and if he or she wished to speak with the doctor. The undercover officers each responded that they were having no difficulties, that they had no questions, and that they did not wish to see the doctor. (Whisenand Dep. p. 159-:18 – p. 161:2, p. 283:1-5).

Undercover Officer Richardson was assigned for follow up to the Kokomo office. On his first Kokomo clinic visit, on April 16, 2014, he was required to submit to a urine drug screen. (Ex. D, ¶ 109(b)). On his second clinic visit, on May 14, 2014, he was given a second urine drug screen test. (Ex. D, ¶ 116). When he appeared for his third clinic visit on June 11, 2014, Richardson was informed that he was being kicked out of the program because his two previous urine drug screens had tested negative for Suboxone. (Ex. D, ¶ 123).

Undercover Officer Katt was assigned to Dr. Agapios' clinic in Carmel. (PCA, ¶ 120(b)). On Katt's third scheduled appointment, a different undercover officer appeared at the Carmel clinic and represented himself to be Katt. (PCA, ¶ 127). He met face-to-face with Dr. Agapios. (PCA, ¶ 127(a)). Before he could leave, the undercover officer pretending to be Katt was told

that he would need to take a urine drug screen. The undercover officer refused the screen, claiming that he was unable to provide a sample and that he needed to catch his ride to work. The undercover officer was informed that he was out of the program, because of his refusal to submit to the drug screen. (PCA, ¶ 127(a)).

An email from Whisenand to his DEA superiors dated May 30, 2014, contained a written "To-Do List" for the investigation. (Ex. 192; Whisenand Dep. p. 338:7-12). The written "To-Do List" included having undercover officers attempt to get one of the doctors to increase the prescription amount. (Whisenand Dep. p. 339:4-13; Ex. 192). None of the undercover officers reported that they had been successful in doing so.

The same written plan stated that the INSPECT reports for DORN patients would be checked to identify patients who had dosages increased. (Whisenand Dep. p. 339:14-20). DORN's records confirmed that dosage increases for patients were exceedingly rare, and that DORN patients were being consistently stepped down and reduced as they were weaned off the Suboxone medication. (Whisenand Dep. p. 210:7 – p. 211:7). The absence of reference in the DEA/DTF investigation file to the results of the INSPECT review implies that the INSPECT review also showed a consistent dosage reduction among DORN patients that was contrary to the DEA/DTF "pill mill" theory.

On June 20, 2014, Whisenand and Klein met with Josh Minkler ("Minkler") of the U.S. Attorney's Office in Indianapolis. Their purpose was to ask the U.S. Attorney's Office to prosecute the DORN case. (*See* Dep. Ex, 167, Design. of Evid., Ex. 9). Minkler was a very experienced federal prosecutor, who had considerable experience prosecuting similar cases. (Design. of Evid., Ex. 9). Klein and Whisenand laid out their case for the federal prosecutors. The federal prosecutors informed Klein and Whisenand that they did not feel like there was

probable cause for prosecution. (Klein Dep. p. 37:22 – p. 38:2). Whisenand and Klein were told that the evidence they had presented to the federal prosecutors was not enough for a "provable case." (Klein Dep. p. 38:3-13, p. 40:2-5).

Dietz had a prior relationship with Joe Hogsett ("Hogsett"), who was the U.S. Attorney at the time. (Dietz Dep. p. 37:10-24). Dietz asked Wichern if it was okay for Dietz to reach out to Hogsett to argue for prosecution. (Dietz Dep. p. 36:17-23). A second meeting was held in early July at the U.S. Attorney's Office. (Dietz Dep. p. 37:25 – p. 38:8). The meeting was attended by Dietz, Klein and Dwight Frost from the CPD, Whisenand from the DEA, and Minkler and Hogsett from the U.S. Attorney's Office. (Dietz Dep. p. 38:12-15). Dietz made the presentation. (Dietz Dep. p. 38:16 – p. 39:6).

Dietz told the U.S. Attorney that he represented the Board Members of the DTF. He felt it was his duty to the Board of the Carmel DTF to try to talk Hogsett into reconsidering declining the prosecution of DORN. (Dietz Dep. p. 39:2-6). The meeting was the CPD's idea and initiative, "because of the impact of this case on their community." (Design. of Evid., Ex. 9, p. 3; Dietz Dep. p. 68:18 – p. 69:11). In an email from Dietz to Miksha dated July 7, 2014, Dietz states that he "volunteered to reach out to Joe Hogsett to basically plea or beg for assistance on this case on behalf of our DTF Executive Board." (Dep. Ex. 209; Design. of Evid., Ex. 10).

Prior to "pleading and begging" the U.S. Attorney to prosecute DORN, Dietz met with the Chief of Police of the CPD. The Chief had the duel capacity as Chief of Police of Carmel and Board Member of the DTF. Dietz obtained his approval to seek to convince federal prosecutors to bring charges against DORN. The Chief of Police agreed that it would be "appropriate" for Dietz to do so. (Dietz Dep. p. 117:17 – p. 118:15).

Minkler of the U.S. Attorney's Office complained to Wichern at the DEA, in a June 25, 2014 email, about "the way I was treated by the diversion investigators and Major Dietz when I tried to provide them advice on the investigation." Specifically, "they treated me like I was a first year deputy prosecutor assigned to screening misdemeanors, rather than the First Assistant U.S. Attorney who had also prosecuted all sorts of drug cases in federal court (including several docs) for the last twenty years." (Dep. Ex., p. 2; Design. of Evid., Ex. 11). Minkler said of Dietz and Whisenand: "It is my understanding, they just want an 'up or down,' and they are not interested in any advice on the investigation." (Dep. Ex. 204, p. 2; Design. of Evid., Ex. 11).

The U.S. Attorney suggested having an undercover officer call Dr. Ley on the phone and attempt to get him to meet at a McDonald's and sell him a prescription. (Dietz Dep. p. 35:7-10). Whisenand was uninterested in the federal prosecutors' opinions because he already had the Hamilton County Prosecutor willing to pursue the matter.

> Q.   Isn't it true that you were told by the U.S. Attorney's Office in this meeting that one of the recommendations they had was that you attempt to get one of the doctors to give a prescription outside the office setting as something that they would find a necessary part of an investigation that they would consider worth attempting to prosecute?
> ***
> A.   They presented – Mr. Minkler presented a couple of options to us, if they had tried those, and we said we had not.
>
> Q.   And you didn't thereafter try them, did you?
>
> A.   No. We were actually pretty much done with our undercover visits.
>
> Q.   So you were done with your investigation even though the U.S. Attorney's Office had told you that there were things you hadn't done that you needed to do.
> ***
> A.   We – the meeting was had – we already had prosecutorial support from Hamilton County. The meeting was had in

> order to see if the U.S. Attorneys' office would be
> interested in prosecuting the case.
>
>                     ***
>
> Q.      So why didn't you do it?
>
> A.      Quite honestly, we just wanted to know if they were
> interested in the case or not.
>
> Q.      You were going to prosecute regardless of what they told
> you, weren't you?
>
> A.      Well, we already had the Hamilton County Prosecutor's
> backing.

Whisenand Dep. p. 136:11 – 138:19.

      10. <u>Whisenand Admissions</u>.

      Whisenand, the lead investigator in the criminal cases against DORN, and the primary author of the Probable Cause Affidavit upon which the criminal charges were based, was deposed on October 10, 2017. He made the following admissions:

    a. Suboxone is a medically appropriate treatment option for the treatment of opioid addiction. (Whisenand Dep. p. 36:23 – p. 37:3).

    b. No DORN patients were found who were prescribed anything more than a therapeutic dose of Suboxone. (Whisenand Dep. p. 167:16-19).

    c. No DORN patients were identified for whom Suboxone treatment was not medically appropriate. (Whisenand Dep. p. 167:20 - p. 168:1).

    d. Each of the undercover officers received a prescription for Suboxone in a therapeutic dose consistent with their reported addiction history. (Whisenand Dep. p. 172:9-15).

e. Each of the individual undercover officers were prescribed a different level of Suboxone, that had been tailored to their level of reported addiction. (Whisenand Dep. p. 172:16-22).

f. The taper schedules given to the undercover officers were medically appropriate. (Whisenand Dep. p. 56:9-12).

g. The DORN protocols had, as their goal, the gradual reduction and elimination of the Suboxone, leaving the patients "clean." (Whisenand Dep. p. 37:15 – p. 38:5).

h. It is not a crime to pre-sign prescriptions (Whisenand Dep. p. 68:9-17).

i. It is not a crime to treat more than one hundred patients at a time with Suboxone (Whisenand Dep. p. 66:18-22).

j. The only crime for which charges were asserted related to the treatment provided by DORN to the undercover officers. (Whisenand Dep. p. 115:18 – p. 116:2).

k. The discussion in the Probable Cause Affidavit of the actual criminal acts asserted begins on p. 41, with the description of the undercover operation. (Whisenand Dep. p. 116:3-6).

l. All of the criminal acts alleged involved <u>only</u> the initial examination and diagnosis by Dr. Ley, that resulted in the undercover officers being admitted to the program for treatment of their "addiction." (Whisenand Dep. p. 355:23 – p. 356:6).

m. The criminal charges were based on the premise that a medical examination sufficient to support a valid diagnosis should have caught that the undercover

officers were lying about being addicts, and were lying about having chronic pain, and therefore they should have been denied admission to the DORN treatment program. (Whisenand Dep. p. 357:11-20).

n. All of the undercover officers claimed that they were currently using opiates and that they were seeking treatment for an addiction issue. Each provided details of the drugs that they were taking and their quantities, in order to obtain admission to the program and be provided treatment with Suboxone. (Whisenand Dep. p. 168:2-16).

o. Whisenand concluded from his investigation that there would have been no criminal violation if Dr. Ley had performed all of the medical tests and examinations that Whisenand contended are necessary to determine whether a patient was lying about being addicted to opioids and/or experiencing chronic pain, at Dr. Ley's initial intake and diagnosis interview. (Whisenand Dep. p. 355:23 – p. 356:6).

p. At all times, Dr. Ley believed that he was treating his patients for their addiction. (Whisenand Dep. p. 359:15-24).

q. At all relevant times, all of the DORN doctors who were charged believed that they were treating a diagnosed addict for addiction utilizing the Suboxone prescriptions as a tool to help those patients defeat their addiction to opiates. (Whisenand Dep. p. 173:22 – p. 175:10).

r. None of the DORN doctors believed that they were selling Suboxone so somebody could get high. (Whisenand Dep. p. 175:11-14).

s. None of the DORN doctors believed that they were prescribing Suboxone for someone to sell. (Whisenand Dep. p. 175:15-17).

t. The DORN non-medical staff were charged solely on the allegation that they were "aiding" the doctors in handing out prescriptions signed by licensed physicians. (Whisenand Dep. p. 68:4-11).

u. It is only a crime for an office staff person to hand out a prescription if the staff member knew that the prescription was itself illegal. (Whisenand Dep. p. 68:12-17).

v. It is not unusual for patients to pick up prescriptions from staff members at any doctors' offices. (Whisenand Dep. p. 154:3-7).

w. The non-medical staff members were not knowledgeable as medical practitioners, and could not have known whether the Suboxone prescriptions were prescribed without a legitimate medical purpose. (Whisenand Dep. p. 295:17 – p. 296:2, p. 296:17-23, p. 297:24 – p. 298:11).

11. <u>Outcome of Criminal Proceedings</u>.

All of the criminal charges against the non-medical staff of DORN were dismissed by the Court in Hamilton County, over the objection of the prosecutor. (Miksha Dep. p. 88:25 – p. 89:8). The Court found the allegations did not allege facts that constitute a crime, as a matter of law. (Ex. 245; Miksha Dep. p. 90:11-19). A Motion to Correct Errors was filed in Hamilton County only as to Andrew Dollard. The Dollard Motion to Correct Errors was denied. (Miksha Dep. p. 94:20 – p. 95:6). No refiling was attempted from any of the Hamilton County dismissals. (Miksha Dep. p. 92:22 – p. 93:16). Miksha believed refiling would be unsuccessful. (Miksha Dep. p. 93:3-16). All charges pending in other counties were voluntarily dismissed by the

prosecutors of those counties.  All criminal proceedings against the non-medical staff of DORN were concluded in favor of the non-medical staff.

In December 2015, all charges against Dr. Agapios were dismissed.  (Agapios Dep. p. 177:9-18).  The record was expunged in February 2016.  (Agapios Dep. p. 177:21-23).  The dismissal was by the prosecutor, but was not in return for any agreement.  (Agapios Dep. p. 239:24 – p. 240:17).  Dr. Ley went to trial in Hamilton County, and was acquitted.  (Ley Dep. p. 189:24 – p. 190:1). Judge Nation entered his verdict of acquittal from the bench, immediately upon the conclusion of closing arguments.  In explaining his ruling, the Judge made the following significant comments on the record:

> The drug that was issued was appropriate for what they were being asked to be treated for.  It was in the proper amount and the step down in treatment program set out was appropriate within the medical profession.  . . . And the State has not shown by the evidence that this was a knowing and intentional act, that *mens rea* was committed.  Therefore, the Court finds that the State has failed to prove that the prescriptions were issued outside the usual course of professional medical procedures.

Trial Transcript p. 1373:4-24.  Charges in Howard County were then dismissed.  (Ley Dep. p. 258:24 – p. 259:1).

## STATEMENT OF ISSUES

The ultimate issue of fact for this Court regarding the DORN physicians is whether Defendants (1) actually believed that DORN's doctors prescribed Suboxone without any "legitimate medical purpose," and (2) whether that belief was reasonable.  The additional ultimate issue of fact as to the DORN staff is whether Defendants reasonably believed that the DORN non-physician staff knew that DORN's doctors prescribed Suboxone without any legitimate medical purpose.

## ARGUMENT

1. <u>Elements of the criminal offenses charged</u>.

The existence of probable cause depends on the elements of the predicate criminal offense under state law. *Sturm v. City of Indianapolis,* 2016 U.S. Dist. LEXIS 65144 (S.D. Ind.) *19, citing *Abbot v. Sangamon County,* 705 F.3d 706, 715 (7th Cir. 2013). The predicate criminal offenses with which Doctors Ley and Agapios were charged are codified at Indiana Code § 35-48-4-2, § 35-41-5-2, and § 35-45-6-2. Ind. Code § 35-48-4-2 makes it a felony to deal in a controlled substance. Specifically, "A person who: (1) knowingly or intentionally: … (c) delivers … a controlled substance … commits dealing."

If this statute could be violated by a doctor writing a prescription for a controlled substance (as opposed to delivering the controlled substance itself), all doctors would be guilty of a crime. That is obviously not the case.

> "The writing of a valid prescription by a licensed physician is an
> absolute defense to a charge of dealing in a controlled substance."

*Alarcon v. State,* 573 N.E.2d 477 (Ind. Ct. App. 1991). The question then becomes whether or not a prescription is "valid."

Ind. Code § 16-42-19-2 establishes when prescriptions are valid:

> (a) … a prescription or drug order for a legend drug is not
> valid unless the prescription or drug order is issued for a legitimate
> medical purpose by a practitioner acting in the usual course of the
> practitioner's business.

> (b) A practitioner may not knowingly issue an invalid
> prescription or drug order for a legend drug.

Intent is an essential element of the crime of dealing in a controlled substance. Ind. Code § 35-48-4-2(a). If DORN's doctors believed that they were treating their patients appropriately, they could not have formed the *mens rea* necessary to commit the crime for which they were arrested

In addition to charging Doctors Ley and Agapios with dealing in a controlled substance, they were charged with conspiring to do so under Ind. Code § 35-41-5-2.

Finally, in addition to being charged with dealing in a controlled substance, and conspiring to deal in a controlled substance, the doctors were charged with corrupt business influence for being associated with, and receiving proceeds from, dealing in a controlled substance, under Ind. Code § 35-45-6-2.

The last 2 charges are derivative of the charge of dealing in a controlled substance. If there is no probable cause for "dealing," there can be no probable cause for the other two charges.

2. <u>Plaintiffs' Claims</u>.

The claims against the United States are brought under the Federal Tort Claims Act. Through the Federal Tort Claims Act ("FTCA"), the United States has assumed liability for its employees' torts as if it were a private employer. 28 U.S.C. § 1346(b)(1). 28 U.S.C. §2680(h) permits a claim for an intentional tort when it is committed by "investigative or law enforcement officers." *Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018).

The FTCA incorporates the substantive law of the state where the alleged tort occurred. *Smith v. United States,* 860 F.3d 995, 998 (7th Cir. 2017). Because Plaintiffs were falsely arrested in Indiana, Indiana law governs their claims. Under Indiana law, the standard for a false arrest is whether (1) the officer believed in good faith that the arrest was made with probable cause, and (2) that such <u>belief was reasonable</u>. *Garrett v. City of Bloomington,* 478 N.E.2d 89, 95 (Ind. Ct. App. 1985). Determinations of both probable cause and good faith are ordinarily made by a jury. *Chelios v. Heavner,* 520 F.3d 678, 868 (7th Cir. 2008); *Chalifant v. Lods,* 994 N.E.2d 740, 744 (Ind. Ct. App. 2013).

The Seventh Circuit expressly recognized a federal malicious prosecution claim in *Julian v. Hanna,* 732 F.3d 842 (7ᵗʰ Cir. 2013). Because the Indiana Tort Claim Act gives police officers absolute immunity from malicious prosecution, there is no adequate state remedy and a plaintiff unjustly deprived of liberty can obtain relief under Section 1983. *Id.* at 845. In *Manuel v. City of Joliet,* 137 S. Ct. 911, 919 (2017) the Supreme Court held that if the legal proceeding establishing probable cause is tainted, and as a result probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights.

To establish a case for malicious prosecution, the plaintiff must prove (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Donovan v. Hoosier Park, LLC,* 84 N.E.3d 1198, 1209 (Ind. Ct. App. 2017). The United Sates does not contest the first or fourth elements. (Brief of United States, p. 24.)

Dietz contests that he "caused" the prosecution because Whisenand drafted the Probable Cause Affidavit, and a prosecutor filed it. Neither is a sufficient defense. Indiana law recognizes that a person may "cause" an action to be instituted even if he does not prosecute the case himself. *Alexander v. United States,* 721 F.3d 418, 423 (7ᵗʰ Cir. 2013)(quoting *F.W. Woolworth Co. v. Anderson,* 471 N.E. 1249, 1253 (Ind. Ct. App. 1984)(first element of malicious prosecution claim "absolutely clear" when defendants prompted prosecution by reporting alleged theft to prosecutor, who then instituted prosecution.).

Claims against Dietz and Whisenand arise under Section 1983 and the Fourth, Fifth and Fourteenth Amendments. For an individual to be liable under Section 1983, he must be personally involved in the deprivation of constitutional rights. Personal involvement or

responsibility does not require direct participation. A plaintiff must only show a causal link between the defendant's conduct and the plaintiff's injury. *Piggle v. Riggle,* 548 F.Supp.2d 652, 657 (N.D.Ind 2008). A police officer who files a false report may be liable for false arrest if the filing of the report leads to a seizure in violation of the Fourth Amendment, even if he did not conduct the arrest himself. *Acevedo v. Canterbury,* 457 F.3d 721, 723 (7th Cir. 2006). A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent. *Rasho v. Elyea,* 856 F.3d 469, 478 (7th Cir. 2017). The defendant may be held liable, if he or she had know[n] about the conduct, facilitate[d] it, approve[d] it, condone[d] it, or turne[d] a blind eye for fear of what they might see.' *Id.* (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992–93 (7th Cir. 1988).

Whisenand was the lead investigator and drafted the Probable Cause Affidavit. Although he is a federal agent, the prosecution he initiated was a state criminal charge in state court. As such, he induced action "under color of state law."

Dietz participated in every aspect of the events leading up to Plaintiffs' arrest and his involvement continued after they were behind bars. Dietz contacted the DEA to report the initial allegations of misconduct against DORN when a deputy coroner informed him of the death from alcohol poisoning of Stephen Mullinex, who had previously been under the care of Dr. Ley. (Dietz Dep., pp. 14-15.) Dietz assigned CPD Sgt. Marc Klein to investigate Mullinex' death and in conjunction with the DEA, pursue the theory that DORN's physicians were handing out Suboxone for cash without providing any medical care (Dietz Dep., p. 17; p. 21.)

Dietz received periodic updates on its progress from Klein, usually in face-to-face meetings. (Dietz Dep., p. 20.) He discussed the case regularly with Whisenand. (Dietz Dep., p. 21.)

When law enforcement officers are in communication with each other regarding a suspect, the knowledge of one officer can be imputed to the other officers under the "collective knowledge" doctrine. *United States v. Lyons,* 73 F.3d 777, 783 n.1 (7th Cir. 2013). Through Whisenand, Dietz knew that the investigators had not identified a single DORN patient who was not an opiate addict (other than the undercovers who falsely presented themselves as addicts. No DORN patient had overdosed on Suboxone. Suboxone was an appropriate medication. DORN never prescribed an amount of Suboxone that exceeded a therapeutic dose. Dietz knew through Whisenand that DORN physicians did not think their patients sought Suboxone in order to sell it or to get high. All of the DORN doctors believed they were providing appropriate medical care to their patients.

The acts of Dietz and Whisenand do not stand in isolation from each other. The Probable Cause Affidavit recites that it is the result of "an investigation conducted by DEA in close cooperation with the Indiana Law Enforcement Officers assigned to the Hamilton/Boone County Drug Task Force." (PCA, p. 1).

The day of the arrests, a representative of the City of Carmel Police Department issued an invitation to a press conference, stating:

> . . . Numerous arrest warrants were served on doctors and employees of these clinics as a result of this long term prescription drug investigation conducted by the HBCDTF and the DEA.

(Dep. Ex. 205; Design. of Evid., Ex. 18; Dietz Dep. p. 74:23 – p. 75:12).

Dietz and Wichern (Whisenand's boss at DEA) led the press conference. (Dietz Dep. p. 42:4 – p. 44:13). Dietz confirmed that the arrests arose from a joint investigation by the Drug Task Force and the DEA, in his deposition. (Dietz Dep. p. 75:13-20). Dietz called Dr. Ley the "Pablo Escobar of Suboxone" and said that DORN's employees were no different than "street corner drug pushers." (Dietz Dep., p. 46.)

Municipal liability arises when prosecution results from the decision of a "final policymaker." While respondeat superior is not available under Section 1983, "a single act or decision of a final policymaker can establish municipal policy," sufficient for the municipality to be liable under Section 1983. *Id.* at 811-12 *quoting McGreal v. Ostrov,* 368 F.3d 657, 685 (7th Cir. 2004). State law determines whether a person possesses final policy-making authority, and therefore can subject a municipality to liability through his or her actions. *Id.* at 812. In Indiana, a police chief is the final policymaker for his municipal police department. *Id. citing Eversole v. Steele,* 59 F.3d 710, 716 (7th Cir. 1995)(citing Ind. Code § 36-8-3-3(g)).

Dietz testified that he had final decision making authority, as Director of the Hamilton/Boone County Drug Task Force, to elect to pursue or withdraw from the prosecution. (Dietz Dep. p. 130:6-13). In addition, the police chief actively participated in the decision to seek prosecution (Dietz Dep. p. 117:19 – p. 118:15), and had advance knowledge of the arrests (Dietz Dep. p. 107:1-3). He acted on behalf of the DTF Board of Directors in soliciting DORN prosecution. (Design. of Evid., Ex. 10).

In deciding the question of probable cause as part of a summary judgment motion, the court must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew. *Williams v. City of Chicago,* 733 F.3d 749, 756, 758 (7th Cir. 2013) (summary judgment in favor of defendants reversed because plaintiff offered sufficient evidence

from which a jury could conclude that he was arrested without probable cause.)  The probable cause standard in a 1983 case does not allow the defendants to rely on facts without regard to the full context of the circumstances known to them and officers can't "close their eyes" to information that undercuts probable cause *Fox v. Hayes,* 600 F.3d 819, 834 (7th Cir. 2010). Defendants are not entitled to inferences that would be reasonable only if other facts known to them are ignored.  *Id.* at 835.  Courts should factor out the "fluff" – the facts pointed out by the defendant that are irrelevant to the probable cause analysis, disputed, or mischaracterized – in analyzing the probable cause issue.  *Id.* While the 7th Circuit does not second-guess the judgment of officers lightly, it recognizes that "courts have an obligation to ensure that the reasons supporting an arrest are objectively reasonable." *Id.* 836.

The presumption of probable cause in a malicious prosecution action resulting from the judicial determination of probable cause in the criminal action is rebutted by evidence of false testimony, fraud, or other improper means.  *Conwell v. Beatty,* 667 N.E.2d 768.  Although a court will presume that a warrant is valid, that presumption is based on an assumption that the information offered to support it was truthful.  *Whitlock v. Brown,* 596 F.3d 406 (7th Cir. 2010). The presumption is overcome if the officer who sought the warrant knowingly, intentionally, or with reckless disregard for the truth, made false statements to the judicial officer and the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest, or if the officer withheld material facts.  *Id.* at 410-11.  "[A]n omitted fact is material if its inclusion would have negated probable cause." *Id.* at 411.

[A] facially valid warrant will immunize only an officer who acts in an objectively reasonable manner in security it . . . ."  *Olson v. Tyler,* 771 F.2d 277, 281 (7th Cir. 1985).  If an officer submits an affidavit containing statements he knew to be false, or would have known to

be false had he not recklessly disregarded the truth, and the remaining information in the affidavit is insufficient to constitute probable cause, the officer's conduct is not only "the active cause of the illegal arrest, but he cannot be said to have acted in an objectively reasonable manner." *Id. See also Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012).

A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue. *Hart v. Mannina,* 798 F.3d 578, 591 (7th Cir. 2015). A reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause. *Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012). Omissions from a probable cause affidavit are made with reckless disregard of the truth "if an officer withholds a fact that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.' " *Id.* (quoting *Wilson v. Russo,* 212 F.3d 781, 788 (3rd Cir. 2000)).

In *Olson, supra,* the 7th Circuit reversed a grant of summary judgment in favor of the police in a 1983 action because the probable cause upon which the arrest warrant was issued was based solely on information they knew or should have known was false. The court held that the same rationale would apply "with equal force" where police officers secure a warrant through intentional or reckless omission of material facts. *Id.* at 282, n. 5. The court clarified that the same reasoning applies to arrest warrants and search warrants because the misconduct of the officer is the same. *Id.* at 282, n.6.

In *Branson v. Newburgh Police Department,* 849 F. Supp. 2d 802 (S.D. Ind. 2011), Plaintiffs filed a Section 1983 action against the town, for actions taken by the police department during a search, pursuant to warrant. Plaintiffs claimed that the warrant to search lacked probable cause. *Id.* at 809. This court held that when a judge is presented with only an affidavit, the validity of the warrant rests solely on the contents of the affidavit. *Id.* Because the warrant was issued solely on the account of an unreliable informant, the warrant lacked probable cause. *Id.* at 810.

3. <u>The DORN Probable Cause Affidavit Contains Multiple False Statements</u>.

The first 41 pages of the Probable Cause Affidavit, comprising the first 102 paragraphs, did not discuss the events for which the criminal charges were brought. The description of the actual alleged criminal acts begins on p. 41 with ¶ 103. (Whisenand Dep. p. 115:18 – p. 116:6). The first 102 paragraphs of the Probable Cause Affidavit include multiple references to hearsay statements attributed to unidentified opiate addicts who had either dropped out or been kicked out of the DORN programs. *See,* Probable Cause Affidavit, p. 9, ¶15 – p. 19, ¶34. The allegations also include a survey of unfavorable comments, posted by anonymous sources on the internet. (Probable Cause Affidavit, pp. 12-13, ¶22. Whisenand had no idea who posted any of the comments, because their authors were unidentified on the internet. (Whisenand Dep. p. 91:2-10).

> A warrant request violates the fourth amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.

*Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012).

The following statements contained in the Probable Cause Affidavit are admitted to be false, and were known to be false by Whisenand when they were included in the Probable Cause Affidavit. The false statements were included for the specific purpose of convincing the Judge that there was probable cause.

1.      In paragraph 4(c), the Probable Cause Affidavit materially misquotes the Indiana Administrative Code. The Probable Cause Affidavit identifies the following as a pertinent provision of the Indiana Administrative Code, upon which the Probable Cause Affidavit is based:

> c. 844 IAC 5-4-1 § 1(d): "A physician shall not prescribe, dispense, or otherwise provide, or cause to be provided, any controlled substance to a person who the physician has never personally physically examined and diagnosed."

The language cited is actually part of a sentence from which Whisenand deleted the relevant and material language. It actually reads:

> § 1.
>  (a)  Except in institutional settings, on-call situations, cross-coverage situations, and situations involving advanced practice nurses with prescriptive authority practicing in accordance with standard care arrangements, as described in subsection (d), a physician shall not prescribe, dispense, or otherwise provide, or cause to be provided, any controlled substance to a person who the physician has never personally physically examined and diagnosed.

The DORN clinics constituted a "cross-coverage situation" as described in the statute.

The actual subsection (d) of § 1 of the statute reads in relevant part as follows:

> (d)  Subsections (a) and (b) do not apply to or prohibit the following:
>                         ***
> (2)  The provision of controlled substances or legend drugs by a physician to a person who is a patient of a colleague of the physician, if the drugs are provided pursuant to an on-call or cross-coverage arrangements between the physicians.

32

The Probable Cause Affidavit falsification of the language of 844 IAC 5-4-1 is particularly troublesome, because the charges against the clinic doctors refer back to paragraph 4(c) as an integral part of the "medical standards," whose supposed violations form the basis of the PCA claim that the prescriptions issued were "outside the usual course of professional medical practice." *See,* Probable Cause Affidavit, Attachment "A," pp. 4-5.

        2.        Subsection 2.  Paragraph 25(B) of the Probable Cause Affidavit alleges that routine urine drug screens were not conducted at DORN.  The undercover officers verified from 21 separate clinic visits that urine drug screens were being run at all of the DORN clinics. (Whisenand Dep. p. 91:15-24).

        3.        Paragraph 26 quotes hearsay information from an anonymous DORN competitor that DORN did not require patients to participate in counseling or any other addiction support.  The undercover officers all received written confirmation of the counseling requirement to which they were required to agree in writing.  (Whisenand Dep. p. 133:7-12, Exs. 81, 132). The DORN pledge, signed by each of the undercover officers, includes the following client agreements:

> 4.  I will attend AA/NA meeting according to staff physicians or office director's instruction.
> ***
> 15.  I will provide the office directors documentation of monthly counseling appointments.

(Dep. Ex. 81; Design. of Evid., Ex. 12).

In addition, the DEA file included a DORN document, with a DEA file date of 3/26/14, which was a "final notice," directed to all patients, reaffirming the mandatory monthly counseling, the location of counseling alternatives, and the requirement that patients provide

proof of attendance or risk expulsion from the program.  (Dep. Ex. 172, p. 3; Design. of Evid., Ex. 5).

4.     The Probable Cause Affidavit alleges that none of the undercover officers were interviewed during their initial visits with Dr. Ley.  *See,* ¶ 37 of the Probable Cause Affidavit, and ¶¶ 104(b), 105(b), 106(b), and 107(b).  Mr. Whisenand admitted that the claims that Dr. Ley did not interview the undercover officers as a part of their initial visit were false. (Whisenand Dep. p. 97:2-18, p. 98:17-20).

5.     In ¶ 63 of the Probable Cause Affidavit, Mr. Whisenand quotes an anonymous pharmacist as stating that the use of Suboxone for pain was "bad medicine." Whisenand admitted in his deposition that he knew that the pharmacist's opinion was wrong. (Whisenand Dep. p. 102:22-25, p. 103:21-23).  Whisenand admitted that he wanted the Judge to consider this unqualified and false medical opinion because it "painted a picture of what was going on in the DORN network."  (Whisenand Dep. p. 103:1-12).  Whisenand wanted the Judge to consider that false statement in determining if there was probable cause.  (Whisenand Dep. p. 104:2-11).

6.     In ¶123 of the Probable Cause Affidavit, Whisenand falsely states that urine drug screens were given to DORN patients with insurance, while drug screens were not given to those without insurance.  The undercover officers confirmed that every DORN patient was going to be required to submit to a drug screen, whether or not they were insured. (Whisenand Dep. p. 120:7-12).  Whisenand admitted that the undercover officers had no basis for claiming uninsured patients were not tested.  (Whisenand Dep. p. 126:17-22).  Whisenand admitted that the undercover officer quoted might not have told him that at all, and that Whisenand may have been the one who actually added that claim.  (Whisenand Dep. p. 127:10 –

p. 128:3). Whisenand admitted that he was aware that drug screens were required of all uninsured DORN patients, including undercover officers. (Whisenand Dep. p. 321:20 – p. 322:8).

7. Paragraph 90 of the Probable Cause Affidavit alleges that Andrew Dollard purchased a home from Dr. Ley that had an assessed value of $425,000 for a sale price of $155,000. That information was false. (Mishka Dep. p. 105:24 – p. 106:3, p. 107:2-8). The purpose of including this misleading information was to try to show that the house was transferred for less than its fair market value, which Whisenand knew had no relevance or legal significance. (Whisenand Dep. p. 112:24 – p. 113:16).

8. Throughout the Probable Cause Affidavit, Whisenand falsely states that cash was exchanged by the undercover officers "in exchange for" prescriptions. This false statement is repeated underlined twenty (20) times in the Probable Cause Affidavit. (*See,* PCA ¶¶ 105, 106, 107, 109, 110, 111, 112, 113, 114, 115, 117, 118, 119, 121, 122, 124, 125, 126, 127, 128). All of these representations that Suboxone prescriptions were being delivered "in exchange for" cash were known by Whisenand to be false. Whisenand knew the DORN fee structure was $300 for the initial entry into the program and two hour diagnostic interview visit. (Whisenand Dep. p. 64:6 – p. 66:8; p. 116:20 – p. 117:2). Whisenand knew that the fee schedule was $40 a week, not "per prescription." (Whisenand Dep. p. 105:3-6; p. 154:8-12). That information was included in the written material provided to each of the undercover officers at the time of their initial visit. (Whisenand Dep. p. 64:6 – p. 66:8).

At the request of the Medical Licensing Board, a Deputy Attorney General investigated a complaint from a competitor that the DORN fee structure amounted to paying for prescriptions. The report concluded that DORN patients were paying a weekly fee for continued care at the

clinic, and that this did not constitute paying for a prescription. This report was placed into the

DEA's "DORN" investigation file on November 26, 2013. (Whisenand Dep. p. 188:17 – p.

189:7). Whisenand admitted that he put false information about DORN's fee structure in the

Probable Cause Affidavit, so that the Judge would consider it in determining probable cause.

(Whisenand Dep. p. 106:8-15).

    If the probable cause affidavit would not have established probable cause without the

false statements, the false statements are material. *United States v. Robinson,* 546 F.3d 884, 888

(7th Cir. 2008). Likewise, "an omitted fact is material if its inclusion would have negated

probable cause." *Whitlock v. Brown,* 596 F.3d 406, 411 (7th Cir. 2010).

    Whisenand put into the Probable Cause Affidavit information that he knew to be false,

because he believed that "was what was needed at the time." (Whisenand Dep. p. 95:20 - p.

96:6).

> Q.    So it was your decision to put in those things you wanted
>        the Judge to be aware of and to consider in ruling on
>        probable cause, didn't you?
>
> A.    Again, myself and ASAC, at the time Dennis Wichern,
>        developed the probable cause, and the prosecutors helped
>        us tweak it as necessary.
>
> Q.    And you made the decision that the appropriate information
>        to put into the probable cause affidavit included
>        information you knew to be false; correct?
>
> A.    I believe that the decision to put in the affidavit was what
>        was needed at the time when I wrote this.

    4.    Material Omissions from the Probable Cause Affidavit.

    A probable cause affidavit must include all material facts known to law enforcement,

including facts that cast doubt on probable cause. *Gerth v. State,* 51 N.E.3d 368, 374 (Ind. Ct.

App. 2016). When material information is omitted from a probable cause affidavit, such

omission will invalidate a warrant if (1) the police omitted facts with the intent to make the affidavit misleading or with reckless disregard for whether it would be misleading, and (2) the affidavit supplemented with the omitted information would have been insufficient to support a finding of probable cause. *Id*

The following material facts known to Whisenand were omitted from the Probable Cause Affidavit.

(a)     All of the DORN patients were required to fill out medication and pain and drug histories as a part of the intake process. (Whisenand Dep. p. 153:10-14).

(b)     Doctors treating patients for addiction do not necessarily perform a physical examination. (Whisenand Dep. p. 152:25 – p. 153:4).

(c)     All of the undercover officers were required to sign a client agreement and pledge including a sixteen point list of agreements that the client is making as a part of his or her treatment. (Whisenand Dep. p. 181:1-23). Whisenand recognized that this was relevant, omitted, exculpatory information. (Whisenand Dep. p. 182:3-9).

(d)     Each of the undercover officers was provided with a schedule showing the approximate dates and amounts of reduction of Suboxone until the patient was entirely off the medication. (Whisenand Dep. p. 182:10-15). Whisenand acknowledged that the Judge might have considered that omitted evidence relevant exculpatory evidence. (Whisenand Dep. p. 183:15-21).

(e)     The undercover officers were all provided the option of a non-narcotic treatment program involving the drug Vivitrol. This was recommended in writing and discussed orally. (Whisenand Dep. p. 163:24 – p. 164:15).

(f)     It was the policy of DORN to dismiss patients who failed to comply with DORN's program requirements.  (Whisenand Dep. p. 284:16 – p. 286:8, p. 287:7-14).

(g)     The opinions quoted in the Probable Cause Affidavit from two experts were obtained without showing the experts the videos of the last undercover visits in June, at which two of the seven undercover agents were dismissed from the program for failing to comply with the urine drug screening requirements.  (Whisenand Dep. p. 327:22 – p. 328:21). The medical experts quoted in the Probable Cause Affidavit gave their opinions at trial without viewing any actual DORN patient's medical records, any actual patient's files, the taper schedules, the Pledge and Patient Contract, or the history of dismissals from the program of non-compliant patients.  (Whisenand Dep. p. 290:24 – p. 292:19).

(h)     It is not a crime for a physician to pre-sign a prescription.  (Whisenand Dep. p. 66:9-17).

(i)     It is not a crime to treat more than 100 patients with Suboxone. (Whisenand Dep. p. 66:18-24).

(j)     Included in the DEA's DORN file was a letter by the Chief of the Liaison and Policy Section of the Office of Diversion Control of the Drug Enforcement Administration in 2006, which confirmed the DEA policy that there is no limit on the number of patients that a doctor may treat with Suboxone in order to taper a pain patient off of an opioid addiction.  (*See,* Dep. Ex. 118; Design. of Evid., Ex. 13; Whisenand Dep. p. 195:19 – p. 196:11).

(k)     All of the undercover officers were told where counseling could be obtained, and that they would be dismissed from the program if they failed to go to counseling. (Whisenand Dep. p. 77:13-24).

(l)     There is nothing in the Indiana Administrative Code that imposes a duty on a non-medical employee of a doctor's office for the proper prescribing and dispensing of controlled substances.  (Whisenand Dep. p. 78:10-13).

(m)     It was not unusual in any doctor's office for prescriptions to be delivered to patients by staff members.  (Whisenand Dep. p. 154:3-7).

(n)     No DORN patient was hospitalized or treated for an overdose of Suboxone.  (Whisenand Dep. p. 163:15-18).

(o)     No DORN patient was prescribed anything more than a therapeutic dose level of Suboxone.  (Whisenand Dep. p. 167:16-19).

(p)     No DORN patient was not medically appropriate for Suboxone treatment. (Whisenand Dep. p. 167:20 – p. 168:1).

(q)     Each of the undercover agents received a prescription for Suboxone that was in a therapeutic dose consistent with their reported addiction history.  (Whisenand Dep. p. 172:9-15).

(r)     All of the undercover agents were given different initial doses of Suboxone, based upon what each had told the doctor concerning their addiction history. (Whisenand Dep. p. 172:16-22).

(s)     All of the undercover officers' INSPECT reports were checked to confirm they were not receiving prescription opioids from any other physician, before they received prescriptions.  (Whisenand Dep. p. 171:18-24).

(t)     All of the undercover officers had to promise in writing that they would attend counseling.  (Whisenand Dep. p. 171:15-17).

(u)     All of the undercover officers were required to agree in writing to submit to urine drug screens upon request.  (Whisenand Dep. p. 171:25 – p. 172:2).

(v)     All of these DORN requirements and practices were inconsistent with the operation of a "pill mill."  (Whisenand Dep. p. 172:3-8).

(w)     In order to obtain federal court permission to utilize undercover agents, Whisenand submitted an affidavit to the court in which he represented that the background information contained in the first 41 pages of the Probable Cause Affidavit was "not sufficient to support a prosecution."  (Whisenand Dep. p. 175:23 – p. 179:5, Ex. 158).

(x)     All of the DORN doctors believed that they were treating people who were addicted to opiates.  (Whisenand Dep. p. 174:1-9).

(y)     All of the DORN doctors thought that the Suboxone they were prescribing was going to help those patients get off their addiction to opiates.  (Whisenand Dep. p. 174:20-25).

(z)     The DORN doctors all believed they were prescribing Suboxone as a tool to help their patients get off their addiction to opiates.  (Whisenand Dep. p. 175:1-10).

(aa)     None of the DORN doctors believed they were selling Suboxone so someone could get high.  (Whisenand Dep. p. 175:11-14).

(bb)     None of the DORN doctors believed that they were prescribing Suboxone for someone to sell.  (Whisenand Dep. p. 175:15-17).

5.   <u>The DEA's "Expert" opinions lack credibility, because Defendants withheld important information from them</u>.

Defendants claim that they were entitled to rely upon the opinions of two hired "experts," whose opinions they included in the Probable Cause Affidavit.  Dr. King's opinions are contained in paragraphs 137 to 141.  Dr. Chambers' opinion is contained in paragraphs 143 and

144.  In paragraph 140 of the Probable Cause Affidavit it is revealed that Dr. King's review consisted entirely of viewing 21 undercover videos made between March and May of 2014. There were actually 28 undercover videos made.  The June videos, which show 2 of the 7 undercover officers being dismissed from the program because they failed or refused urine drug screens, had not yet been provided to Dr. King.  Paragraph 144 confirms that Dr. Chambers' Probable Cause Affidavit opinion was similarly based on only the 21 videos ending in May, which did not show these significant events.

At the criminal trial of Dr. Ley, Dr. King confirmed that the only information supplied to him for review prior to <u>trial</u>, were the videos made by the 7 undercover officers, and partial files containing the incomplete paper portion of the files of 5 of the 7 undercover officers.  (King Trial Testimony p. 812:16-21, p. 813:5-9).  Dr. King was not shown any portion of the computerized medical records that DORN maintained on all of its patients, including the undercover officers. (King Trial Testimony p. 838:16-24).  Dr. King was not provided with counseling records of any DORN patients.  (King Trial Testimony p. 839:23-24).  Dr. King was not given the statements or depositions of any other DORN staff members or DORN patients (King Trial Testimony p. 840:3-18).  Dr. King requested that Whisenand provide him with additional information, including electronic records and INSPECT reports and counseling records, but the DEA (Whisenand) failed to provide any.  (King Trial Testimony p. 841:6 – p. 842:15).

Dr. Chambers' opinions were similarly limited by the failure of the DEA to provide him with the information necessary to understand, much less evaluate, the DORN procedures.  Dr. Chambers was only given partial paper records of 5 of the 7 undercover officers, and the videos of the undercover officers' visits.  (Chambers Trial Testimony p. 988:24-25).  He received no

counseling records. (Chambers Trial Testimony p. 989:6 – p. 991:10). He only saw records of 5 of the 7 undercover officers. (Chambers Trial Testimony p. 922:9-17).

No one advised either of the DEA experts of the legal standard and of the elements of the crimes being asserted. Dr. Chambers' opinion in the Probable Cause Affidavit never mentions any criminal acts, nor does he identify any deviation by DORN from any identified medical standards. Paragraph 144 of the Probable Cause Affidavit is nothing but Dr. Chambers' unsupported allegation that practices and procedures which he does not identify, violated standards he does not disclose.

Dr. Chambers' total lack of understanding of the elements of the crimes alleged permeated his trial testimony, as well. At trial, Dr. Chambers alleged that the "criminal" acts of DORN included allowing a DORN employee to wear a t-shirt to work with a Guinness logo. (Chambers Trial Testimony p. 945:18 – p. 946:12). He spent much of his testimony asserting that, in his opinion, DORN did not sufficiently respect the confidentiality of patients, because patients discussed their addiction issues in front of other patients. (Chambers Trial Testimony p. 927:18 – p. 929:22). Dr. Chambers actually criticized DORN at trial for having kicked out of the program the two undercover officers who failed urine drug screens! He opined that DORN had a duty not to "abandon" these patients by their expulsion. (Chambers Trial Testimony p. 977:5 – p. 979:1).

Whisenand and Dietz were not entitled to rely upon the opinions of hired "experts," when they withheld important factual information from the experts, and failed to inform them of the legal standards, or the legal elements of the criminal charges actually being asserted.

    6.  <u>Whisenand omitted exculpatory evidence from their consulting experts from the Probable Cause Affidavit</u>.

The Probable Cause Affidavit fails to advise the Judge that Dr. King had no experience in the treatment of addiction, and had never prescribed Suboxone. (King Trial Testimony p. 781:9-14). In his own practice in running a pain clinic, Dr. King puts 50% of his patients on opioid pain killers. (King Trial Testimony p. 877:24 – p. 878:3).

Dr. King does not treat patients for addiction. (King Trial Testimony p. 865:1). If he thinks a patient needs addiction treatment, he refers them out for Suboxone treatment elsewhere. (King Trial Testimony p. 864:22-24, p. 857:17-18). As a result of his lack of experience, Dr. King was not even offered as an expert in the diagnosis and treatment of addiction at trial. (King Trial Testimony p. 789:3-9).

Whisenand testified in his deposition that all of the criminal charges against all of the Plaintiffs were based on the allegation that Dr. Ley performed an insufficient physical examination before admitting new patients to the program. (Whisenand Dep. p. 355:23 – p. 356:6). Yet at trial, Dr. King testified that if Dr. Ley did not do a complete or focused physical exam prior to accepting a patient into the program, that failure would only be a "minor excursion from the standard of care." (King Trial Testimony p. 884:13-15).

Unlike Dr. King, Dr. Chambers has an addiction practice. Whisenand omitted from the Probable Cause Affidavit that in most material respects, Dr. Chambers' practices and procedures were identical to, or even less stringent than, the practices and procedures at DORN described in the Probable Cause Affidavit.

The Probable Cause Affidavit was critical of the amount of time that Dr. Ley spent in his initial meeting with applicants to his program in order to assess and diagnose their addiction. Each of the undercover officers underwent a 2 hour face-to-face meeting with Dr. Ley, at least 1 hour of which was spent answering questions concerning their drug use and abuse history. (*See,*

Probable Cause Affidavit ¶¶ 104, 105, 106, 107).  Dr. Chambers admitted that his initial diagnostic interviews are as short as 30 minutes, and average 1 hour.  (Chambers Trial Testimony p. 905:15-25).

Dr. Ley spent substantial time at the initial interview describing the nature of addiction, the DORN program, Suboxone, and their options.  Dr. Chambers testified that he does exactly the same.  (Chambers Trial Testimony p. 909:11 – p. 910:18).

DORN ran random drug screens on their patients, to detect non-compliance.  The drug screens are random, to prevent the patients from anticipating the testing.  Dr. Chambers does exactly the same thing.  (Chambers Trial Testimony p. 911:15-24).

DORN required follow-up visits by patients once a month, at which time they would be face-to-face with DORN staff and/or DORN doctors.  The Probable Cause Affidavit was critical that some of the undercover follow-up visits were brief.  These visits were brief because the undercover officers affirmatively represented that they were doing well on the treatment and experiencing no problems and did not wish to speak with a doctor.  In Dr. Chambers' practice, follow-up visit length also varied by each patients' reported needs.  Dr. Chambers' follow-ups are often every 2 months, and typically took only 15 minutes.  (Chambers Trial Testimony p. 913:8-25).

The Probable Cause Affidavit was critical that DORN doctors sat next to a staff member to observe the patient, while the patient was questioned about any issues with their medication. In Dr. Chambers' own practice, non-doctor employees make a "focused assessment" of the patients' status on follow-up visits by simply observing patients standing in line waiting to get their medication.  (Chambers Trial Testimony p. 984:1 – p. 985:3).

Dr. Chambers agreed with Dr. Ley at trial, that no physical examination of the patient is required to make a valid diagnosis of addiction. Dr. Chambers concurred that the appropriate exam is not a physical exam, but is instead a "focused assessment" in the form of a "mental status exam." (Chambers Trial Testimony p. 1004:19 – p. 1005:5).

The critical element of the crimes for which the DORN doctors and staff were charged is the assertion that the prescriptions written for patients did not have a "legitimate medical purpose." Yet at trial, Dr. Chambers testified that the prescriptions written by DORN, for each of the undercover officers whose treatment he examined, were in the appropriate dose for the symptoms described. In fact, the total daily dose range was what he would personally have used, and was "reasonable decision making" on the part of Dr. Ley. (Chambers Trial Testimony, p. 1004:6-18).

Dr. Chambers was critical of DORN for expelling patients whose failed urine drug screens showed that they were not following the medical program. But the establishment of taper schedules to wean patients off of Suboxone, and the expulsion of patients who failed urine drug screens, is fundamentally and inherently inconsistent with the allegation that DORN was a "pill mill," prescribing Suboxone for any non-medical purpose. (Miller Trial Testimony p. 1145:4 – p. 1146:5).

Dr. Chambers took the inconsistent positions that it was improper for DORN to expel the undercover officers who failed their drug tests from the program, because they should not have been "abandoned," but that it was also improper to provide expelled patients with an "exit script" of Suboxone to last them until they could locate a different program or provider. In fact, "exit scripts" fulfill the doctor's duty to not "abandon" the patient. Exit scripts are a standard practice in addiction medicine. (Miller Trial Testimony p. 1083:23 – p. 1084:4).

The jury is entitled to infer that the opinions expressed by Dr. King and Dr. Chambers at trial, were also available to Whisenand at the time he wrote the Probable Cause Affidavit. The jury can infer that the omission of these exculpatory expert opinions from the Probable Cause Affidavit was intentional, and constitutes evidence of malice.

       7.   <u>A jury is entitled to find there was no probable cause</u>.

In a malicious prosecution action, the question of malice is one for the jury and may be inferred from a lack of probable cause. *Crosson v. Berry,* 829 N.E.2d 184, 197 (Ind. Ct. App. 2005). The question of probable cause is typically for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. *Pribble v. Town of Winona Lake*, 2007 U.S. Dist. LEXIS 28517 at *9.

In *Tibbett v. McPherson,* 5 F. Supp. 3d 989, (S.D. Ind. 2014), Plaintiff filed Section 1983 claims against police officers, and false arrest claims against the police chief and the City of Seymour after his arrest for disorderly conduct. Defendants moved for summary judgment, arguing that they had probable cause to arrest plaintiff for violating Ind. Code § 35-45-1-3. The Court held:

> "Because the underlying facts for a probable cause determination are in dispute, the court cannot find that, as a matter of law, probable cause existed in these circumstances. *See Wheeler v. Lawson,* 539 F.3d 629, 634 (7th Cir. 2008) (finding that '[t]he probable cause determination must be made by a jury 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'")

*Id.* at 993.

       8.   <u>Defendants' case examples of evidence of intent are dissimilar</u>.

21 USC 841(a)(1) is the Federal statute which makes it unlawful for a person to knowingly distribute a controlled substance. To convict a person of violating the federal statute,

the government must prove the knowledge and intent of the defendant.  *United States v.*
*Pellmann*, 668 F.3d 918, 923 (7ᵗʰ Cir. 2012).  "Where the defendant is a physician, … the
government must also show that he prescribed controlled substances "outside the course of
professional practice" and (2) without a "legitimate medical purpose."  *Id. citing United States v.*
*Chube,* 538 F.3d 693 (7ᵗʰ Cir. 2008). To convict a practitioner, the government must also prove
that the practitioner acted with intent to distribute the drugs outside the course of professional
practice.  *United States v. Chube,* 538 F.3d 693, 698 (7ᵗʰ Cir. 2007).  In other words, there must
be a finding that the doctor's intent was "to act as a pusher rather than a medical professional."
*Id.* at 698.

Because of the similarity of the Federal statute to the Indiana statute, defendants have
cited to a number of cases involving doctors decided pursuant to the Federal Statute.  A review
of those cases shows how different the fact situations are from this case and how much more is
required to have probable cause to arrest a doctor for dealing in a controlled substance.

In *Pellman,* the doctor was board certified in radiology and phlebology (vein disease), but
was issuing a large percentage of prescriptions for fentanyl to Evans, a nurse who was working
for him.  He administered the fentanyl at Evans' home and at his own home and he did not
document it.  Even after Evans sought treatment for this opiate dependency (by taking Suboxone,
ironically), the doctor continued to give Evans daily doses of fentanyl.  The doctor was convicted
of distributing fentanyl in violation of the federal statute because he was not distributing it in the
usual course of his professional practice in radiology and phlebology, or for a legitimate medical
purpose.

In *United States v. Moore,* 423 U.S. 122 (1975), the doctor was charging per quantity of
methadone rather than fees for medical services rendered.

In *United States v. Kohli,* 847 F.3d 483 (7th Cir. 2016), the doctor routinely prescribed highly addictive opioids to patients with a history of drug addiction and who were known to be multi-sourcing (simultaneously obtaining various prescriptions for controlled substances from multiple sources or providers.)  *Id.* at 487.   He prescribed early refills to patients who repeatedly claimed their narcotic medications had run out or were lost or stolen, and who had irregular toxicology screens in which they tested negative for the drugs that he had prescribed, but positive for other drugs.  *Id.*

In *U. S. v. Rosenberg,* 585 F.3d 355 (7th Cir. 2009), the nurse practitioner prescribed OxyContin, Vicodin, and fentanyl to nine people, each of whom she knew did not have a legitimate need for the medications.  She did not have an office.  She sold the drugs at a used-clothing store, and a Walmart parking lot.

In *Jong Hi Bek v. U.S.,* 2008 U.S. Dist. LEXIS 96284, the doctor did not request past medical records, order drug tests, or recommend lifestyle changes.  *Id.* at * 3.  He did not recommend medication, but prescribed whatever drugs the patient requested.  This included a prescription for Viagra to a woman even though Viagra has no authorized indications for women.  *Id.* at 4.  The doctor did not follow up to determine whether the drugs were effective.  *Id.* at *3.  Several of the drugs he prescribed were not indicated for the uses for which he prescribed them.  *U.S. v. Jong Hi Bek,* 493 F.3d 790, 797 (7th Cir. 2006). His prescriptions were inconsistent.  He prescribed a steroid for a patient who told him that he was lifting weights and wanted to gain weight, then prescribed diet pills at the next visit because the patient said he wanted to lose weight.  *Id.* at 796. He prescribed multiple medications having the same effects, and drugs that are dangerous when taken in combination.  *Id* at 799.

*Alarcon* was decided under the Indiana statute. In *Alarcon,* the doctor's prescription transactions were accompanied by his sale of discount watches, jewelry and clocks to the same individuals. He wrote prescriptions for patients in the name of other patients.

9. The jury is entitled to find actual malice.

    a. The legal standard for showing actual malice.

"Malice" in the context of malicious prosecution means that the officer who initiated the prosecution had 'any motive other than that of bringing a guilty party to justice.'" *Williams v. City of Chicago,* 733 F.3d 749, 759-60 (7th Cir. 2013). A jury can infer malice from an absence of probable cause. *Id.* at 760. To defeat summary judgment in a malicious prosecution case, a plaintiff "is not required to 'clearly prove' the lack of probable cause or to come forward with evidence that would *require* the court to infer malice." *Id.* A plaintiff is required only to provide evidence that would *permit* a finding of no probable cause and *permit* a reasonable inference of malice. *Id.* If plaintiff does so, he is entitled to have a jury determine whether the officers acted with malice. *Id.*

Malice may be inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances, but it also may be shown expressly by evidence of personal animosity. *Golden Years Homestead, Inc. v. Buckland,* 557 F.3d 457, 462 (7th Cir. 2009) (citing *F.W. Woolworth Co., v. Anderson,* 471 N.E.2d 1249, 1254 (Ind. Ct. App. 1985)). Behavior that is "excessively negative, improper, or malicious" establishes personal animosity to the level required to support an allegation of malice. *Golden Years Homestead, Inc. v. Buckland,* 466 F. Supp. 2d 1059, 1071 (S.D. Ind. 2006), *aff'd,* 557. F.3d 457.

"Reckless disregard for the truth" may be proved either by showing (1) the affiant entertained serious doubts as to the truth of his allegations; or (2) circumstances indicating that

the affiant had obvious reasons to doubt the veracity of the allegations. *U.S. v. Williams* 737 F.2d 594, 602 (7th Cir. 1984).

In *Peoples Bank & Trust Co. v. Stock*, 392 N.E.2d 505 (Ind. Ct. App. 1979), the bank took the advice of an attorney who had represented the boyfriend's ex-wife in a divorce, and filed a lawsuit against the beneficiary, claiming that she was not entitled to insurance proceeds. After it was determined that the beneficiary was entitled to the proceeds, she filed a malicious prosecution case against the bank, and won a judgment. The Bank argued that the beneficiary had failed to prove malice because she and the bank had no relationship other than the bank cashed a check for her once. The bank stated "[i]t is difficult to understand how one could have malice toward another who is virtually non-existent."

In upholding the plaintiffs' verdict, the Appeals Court responded:

> "'…In the legal sense any wrongful act done willfully and purposely and without just cause or excuse, to the injury of another, is, as against that person, malicious; and malice in the sense of the law, does not presuppose personal hatred or revenge but may be implied under certain circumstances from a total want of probable cause, or from gross or culpable omission to make suitable and reasonable inquiry, and both want of probable cause and malice must be shown to exist to entitle plaintiff to recover. Malice is a question of fact for the jury, who may infer it from a want of probable cause, though they are not bound to do so.'"

*Id.* at 510, *quoting Pontius v. Kimble,* 104 N.E. 981, 56 Ind. App. 144, 145-46 (1914).

   b. <u>Evidence of Actual Malice</u>.

   (1) <u>Whisenand and Mishka Intended to "F**k DORN"</u>.

Early in the investigation of DORN, the Drug Task Force established "King Ranch" as a code name for the DORN investigation. (Mishka Dep. p. 54:3-17). "King Ranch" was the vehicle that Dr. Ley drove, which would be one of the DTF targets for seizure and forfeiture. In an email dated July 12, 2014, Whisenand told Mishka and other members of the group that they

needed to come up with a better name than Operation King Ranch, as the "vehicle is only a bit player in this operation."  (Dep. Ex. 191; Design. of Evid., Ex. 19).

Deposition Exhibit 177 (Design. of Evid., Ex. 20) is a memo from Mishka to Whisenand and Klein, accepting Whisenand's suggestion to change the operation code name.  The new name used to refer to the DORN investigation was "Operation Corbin Bernsen."  Miksha explained in the memo to Whisenand, and in his deposition, that the new code name meant "f***k DORN," because that was what Defendants were planning to do.

> Also, we have Matt's new suggestion for the operation's name.
> The thought process:  Actor Corbin Bernsen played Roger Dorn in
> the Major League films.  The double meaning to Roger is
> significant (check urban dictionary).  As we are planning to
> "Roger" D.O.R.N., it seemed appropriate:)  Ex. 177.

Miksha confirmed in his deposition that the "double meaning" of "Roger" to which his memo referred was the "F" word.  (Miksha Dep. p. 55:7-17).

Renaming the investigation that led to the arrests and prosecution of the Plaintiffs as "Operation f**k DORN," is compelling evidence of Defendants' prejudgment of this "investigation."  The behavior is unquestionably excessively negative, improper and malicious. It is sufficient by itself to create a genuine issue of material fact regarding malicious intent.

(2) Post-Dismissal Evidence of Malice.

Following the dismissals of all of the criminal charges against the non-medical staff members, on March 18, 2015 Whisenand sent an email to Mishka attaching a summary of activities of all of the DORN employees who were charged.  Whisenand requested Mishka to review that information for the purpose of trying to find a way to refile charges against any or all of the non-medical employees whose cases had been thrown out of court.  (Whisenand Dep. p. 253:22 – p. 254:22).

The prosecutor told Whisenand he was considering redrafting the charges to refile against Andrew Dollard, after the charges against Dollard were dismissed and the Motion to Correct Errors was denied. Whisenand's response to Mishka's email was "excellent." (Whisenand Dep. p. 252:2-24).

After the prosecutor voluntarily dismissed the charges against Dr. Agapios, Whisenand worked with the Indiana Attorney General's Office to seek to oppose Dr. Agapios' medical licensure. (Whisenand Dep. p. 256:24 – p. 257:24). Mishka, Whisenand, and Klein from the CPD, were meeting together as late as April 2, 2016 about working with the Attorney General's Office to try to prevent Dr. Agapios' license reinstatement, and to consider finding a way to refile charges against him. (Whisenand Dep. p. 260:23 – p. 262:11, Dep. Exs. 181, 182; Design. of Evid., Ex. 14).

After the dismissal of criminal charges against Dr. Agapios, Whisenand assisted Jessica Krug ("Krug") of the Indiana Attorney General's Office in pursuing a disciplinary complaint against Dr. Agapios before the Indiana Medical Licensing Board. Whisenand and Krug attempted to get the prosecutor to refile the criminal charges against Dr. Agapios, in an effort to render the Probable Cause Affidavit admissible in the Licensing Board proceeding. Charges were not refiled, but the Licensing Board nevertheless allowed the Whisenand Probable Cause Affidavit to be offered as evidence of the charges against Dr. Agapios. (Whisenand Dep. p. 256:3 – p. 257:24).

In that matter, Whisenand and Krug alleged that the Probable Cause Affidavit demonstrated five different violations of Indiana Code § 25-1-9-4. Section 25-1-9-4 is entitled "Standards of Professional Practice, Findings Required for Sanctions." (Deposition Exhibit "87;" Design. of Evid., Ex. 15).

Findings of Fact and Conclusions of Law were issued by the Medical Licensing Board on November 15, 2016. The findings of the Medical Licensing Board are Deposition Exhibit "86." (Design. of Evid., Ex. 16). Dr. Agapios was found to be subject to discipline under I.C. § 25-1-9-4(a)(1)(B) which is that he "engaged in fraud or material deception in the course of professional services or activities." The specific "material deception" referenced was that he signed some prescriptions on the day before they were actually delivered to the patient. As a result of that "deception" he was issued a letter of reprimand, which states in material part: "The purpose of this reprimand is to stress the important responsibility that you have by reason of a possession of a license to practice medicine in the state of Indiana. This includes not pre-signing prescriptions for controlled substances." (Design. of Evid., Ex. 16).

The decision is relevant for the violations the Board found did not occur. The Medical Licensing Board found that the material submitted to it, including the Whisenand Probable Cause Affidavit, <u>failed to establish</u> that Dr. Agapios had violated the following provisions of the Indiana Standards of Professional Practice:

1. Dr. Agapios <u>did not violate</u> Section 4(a)(3) of the statute, which reads: "A practitioner has knowingly violated any state statute or rule, or federal statute or regulation, regulating the profession in question."

2. Dr. Agapios <u>did not violate</u> Section 4(a)(4)(A)(II), which is "Professional Incompetence."

3. Dr. Agapios <u>did not violate</u> Section 4(a)(4)(B), which is "failure to keep abreast of current professional theory or practice."

4. Dr. Agapios <u>did not violate</u> Section 4(a)(13), which is "assisted another person in committing an act that would be grounds for disciplinary sanctions under this chapter."

In addition, Dr. Agapios was not even charged by the state with any violation of Section (a)(8)(A), or Section (a)(9). Section (a)(8)(A) prohibits a practitioner from "diverting a legend drug" (such as Suboxone). Section (a)(9) sanctions a doctor who "except as otherwise provided by law, has knowingly prescribed, sold, or administered any drug classified as a narcotic, addicting, or dangerous drug to habitué or addict."

The significance of the decision of the Indiana Medical Licensing Board is that the Probable Cause Affidavit, upon which Dr. Agapios was arrested, failed to show that Dr. Agapios had violated any state or federal statute, rule, or regulation. The Indiana Attorney General and the Medical Licensing Board concluded that Dr. Agapios had not diverted Suboxone, and had not prescribed Suboxone "except as otherwise provided by law."

(3). <u>Improper Political Considerations</u>.

Whisenand considered it "kind of important" to know the political affiliation and connections of Andrew Dollard. Dietz's DTF sent undercover officers to conduct surveillance at Dollard's political fundraisers. (Klein Dep. p. 55:24 – p. 56:19). The DEA supplied sophisticated, high resolution recording equipment for Dietz's DTF to use for political surveillance of Dollard. (Dietz Dep. p. 56:23 – p. 57:8). The purpose of the Dollard political surveillance was to identify who might be politically supporting Dollard. (Klein Dep. p. 81:21 – p. 8 2:6).

Andrew Dollard was a political candidate. He ran unsuccessfully for Hamilton County Council in 2014. The DEA's investigation file includes copies of Andrew Dollard's political

campaign literature, obtained by the DEA on May 8, 2014. (Whisenand Dep. p. 221:19 to p. 222:12).

In his affidavit in support of Motion for Summary Judgment, Mayor Brainard acknowledges that he was personally receiving complaints about the presence of the DORN clinic in downtown Carmel. On August 14, 2014, Dietz sent an email to Mishka indicating that he had received a phone call "from a person in the 'political circle'" concerning the charges against Dollard. (Dep. Ex. 210; Design. of Evid. 17). After the U.S. Attorney's Office refused to prosecute, because they found the evidence insufficient, Dietz determined that it was his "duty" to seek reconsideration of that decision as a representative of the Board of the DTF. (Dietz Dep. p. 38:16 – p. 39:6). The second meeting with the U.S. Attorney, at which Dietz "begged" for the prosecution of DORN, was the "idea and initiative" of the Carmel Police Department. Dietz did so "because of the impact of this case on their community." (Dietz Dep. p. 69:8 – p. 70:11).

Dietz admitted that he had conversations with the Carmel Police Chief about trying to convince federal prosecutors to bring charges against DORN. (Dietz Dep. p. 117:17 – p. 118:13). The Carmel Police Chief is on the Board of the DTF. (Dietz Dep. p. 118:14-15). The reference by Maj. Dietz in his email to inquiries he had received about Dollard's prosecution from the "political circle," was a reference to a call from the Carmel Police Chief. (Dietz Dep. p. 120:7-14). The Carmel Police Chief had received a call from someone else "in the political circle." Dietz testified that the Chief was "connected." His boss "is a politician," specifically Mayor Brainard. (Dietz Dep. p. 120:15-21).

Dietz characterized the Chief as "connected" with political people. Dietz admitted the Chief talks to the politicians, because there is a "political side" of his responsibilities as Chief.

The Chief is appointed by the Mayor, and serves at the Mayor's pleasure.  (Dietz Dep. p. 121:10-23).

           (4)  <u>Wichern and Whisenand Personally Opposed Treating Addiction Medically</u>.

At a press conference that was jointly held by Dietz and Wichern on the day of the DORN arrests, Dietz described Dr. Ley as the "Pablo Escobar of Suboxone."  (Dietz Dep. p. 109:11-25).  He based his statement on the number of addicts that were being treated by Dr. Ley's clinics.  The DEA told Dietz that the number of DORN Suboxone prescriptions was "off the charts," compared to what they had seen before.  (Dietz Dep. p. 110:12-19).  Whisenand and Wichern, and their two medical "experts," believed that the treatment of large numbers of addicts with Suboxone was "not acceptable."  (Dietz Dep. p. 111:14 – p. 112:11.

Whisenand and Wichern had a different approach to the opiate epidemic.  It was their position that the appropriate treatment of opiate addiction was the imprisonment of addicts, where they would be forced to go through withdrawal "cold turkey."  From the beginning of their investigation, they had been communicating with Indiana state prison officials.  They determined that the real problem was not that there were insufficient numbers of doctors using Suboxone to treat opiate addicts.  The real problem was there was too much Suboxone smuggled into prison by addicts fearful of withdrawal.

> Q.      How many of the patients of DORN do you think were faking their addiction other than the ones you sent in and told to fake an addiction?
>
> A.      I couldn't tell you, but I can tell you that it is a major problem in our prison system, basically Suboxone being smuggled into the prison system.
>
> Q.      Is that somehow connected to your answer or to DORN?
>
> A.      DORN was the biggest provider of Suboxone in the state.

***

Q.    Did you attempt to find out where the Suboxone in prisons came from?

A.    No.

Q.    So you have no idea if they had anything to do with any patient of DORN?

A.    I wasn't directly involved with what was going on in the prison system.

                                    ***

Q.    Who did you talk to about trying to get rid of Suboxone?

                                    ***

A.    We were informed that there was an issue with Suboxone in the prison system. I don't remember the individual's name, but it is in one of the reports that is provided in discovery.

Q.    How did you come to be talking to the prison system about Suboxone?

A.    Another – It may have been Dennis Wichern who actually had that conversation, and then that – was ended up connected with that individual.

Q.    What did you determine about the reasons why Suboxone was smuggled into prisons?

A.    There's two reasons. It actually can be abused. We've seen it abused on the street as well. But it also can be used to – say you are a heroin addict and you're in prison and you don't want to go through withdrawals, you may try to get some Suboxone.

Q.    And you would be better off getting Suboxone than heroin, which is quite likely to kill you.

A.    Well, if you're in prison you are supposed to be cold turkey. You just go through withdrawals.

Q.    And is that the recommended system of opiate treatment, imprisonment and cold turkey withdrawal?

A.    It was then.

Q.    Okay. And were you a supporter of that position?

A.    Well, you couldn't have controlled substances in the prison,
       so just go through it.

Whisenand Dep. p. 38:18 – p. 41:19.

(5)    "Policing for Profit."

The budget of the DTF was between $400,000 and $500,000 per year.  (Dietz Dep. p.

135:4-13).  On the same day the arrests were conducted, Task Force officers seized bank

accounts and personal assets belonging to Dr. Ley totaling $496,667.39.  (Dep. Ex. 175; Design.

of Evid., Ex 21).

The Hamilton County Prosecutor's Office had an attorney under contract whose sole

function was to file civil actions to forfeit seized property.  (Mishka Dep. p. 36:15 – p. 37:10).

Bruce Pettit ("Pettit"), the Prosecutor's office's forfeiture attorney, attended the meetings of the

DTF concerning the DORN investigation.  (Mishka Dep. p. 36:15 - 37:12).  Pettit, Miksha,

Whisenand, and Dietz discussed how to arrange the forfeiture claims to maximize the amount of

DORN's and Dr. Ley's assets that could be forfeited specifically to the DTF, rather than to other

agencies or funds.  (Miksha Dep. p. 38:19 – p. 39:7).  Whisenand and Klein briefed Dietz on

their intent to seize assets.  (Dietz Dep. p. 131:8-19).

Attachment "D" to the Probable Cause Affidavit is titled "Assets and Requests for

Seizure."  The assets sought for forfeiture included five bank accounts, multiple vehicles,

including watercraft, and four parcels of real estate, including Dr. Ley's home.  One of the items

listed is Dr. Ley's "King Ranch" truck.  (*See*, PCA; Design. of Evid., Ex. 8).

An administrative assistant was assigned to identify and track all of the assets that were

seized in the DORN case.  (Klein Dep. p. 79:2-17).  She was assigned to perform that task for the

DTF, although she was actually an employee of the CPD.  (Klein Dep. p. 79:18-24).  Her

specific duty assignment with the DTF was to maintain and update lists of assets that could be seized for forfeiture. (Klein Dep. p. 79:25 – p. 80:3).

DORN office managers were followed after they left the DORN offices, for the purpose of determining where they would deposit money. (Whisenand Dep. p. 108:8-10). Whisenand always looked at the financial aspects of an investigation. (Whisenand Dep. p. 108:15-18). The financial examination of DORN was done solely for the purpose of identifying what could be seized by DTF as the "proceeds" of "an illicit activity." (Whisenand Dep. p. 108:19-24). The purpose of Whisenand's financial investigation was to help identify and locate money or other assets that could be seized and forfeited to the DEA and to the DTF. (Whisenand Dep. p. 113:17 – p. 114:5).

Anything that could be considered "proceeds from illicit activity" was a source of money that could be seized. That money would then be forfeited to the DTF, after the DEA took its 20% cut of the funds seized. (Whisenand Dep. p. 108:25 – p. 109:9). Identifying accounts and assets that could be seized and forfeited to the DTF was something that Whisenand admitted was "always considered under any criminal investigation we do." (Whisenand Dep. p. 109:10-15).

Under state statutes, seized assets forfeited to the state would be divided between the police agency involved and the school fund. (Mishka Dep. p. 37:23 – p. 38:10). During the "investigation" of DORN, Whisenand and Dietz discussed how they could maximize the amount of the assets seized from Dr. Ley and DORN that would end up funding the DTF. (Mishka Dep. p. 38:19 – p. 39:7). The assets seized by DTF were transferred to the DEA. Forfeiture proceedings were then initiated under federal forfeiture law, rather than state statutes which required forfeiture funds to be shared with entities other than the police agencies behind the seizures.

The federal forfeiture claims against Dr. Ley were settled for allowing DEA to retain $263,000 of Dr. Ley's personal assets. Whisenand agreed to that settlement because the settlement meant all of the money obtained would be split between the DTF and DEA. (*See*, Ex. 176, Whisenand Dep. p. 234:16 – p. 235:7).

Dietz's DTF and Whisenand's DEA split $263,000 of Dr. Ley's assets, with 80% going to the DTF. (Dietz Dep. p. 132:12 – p. 133:6). The $210,400 DTF took from Dr. Ley financed approximately half of the DTF's budget for an entire year. That was ample financial motive for Dietz and Whisenand to initiate a criminal prosecution, even knowing that no crime had been committed.

(6)     The Search for a Crime to Charge.

Evidence of actual malice can be found in the nature of the initial investigation. In this case, the Defendants were not focused on investigating a crime. They were instead focused on attempting to find a crime to investigate.

When the investigation began, Dietz contacted Miksha for the specific purpose of attempting to identify "what was criminal." (Dietz Dep. p. 24:20 – p. 25:11). The DTF Agents under Dietz's command searched through the trash at Andrew Dollard's residence, and at Dr. Ley's residence. The goal was "just to see if there was any evidence that could be used." (Whisenand Dep. p. 109:25 – p. 110:12).

Whisenand acknowledged that, at the time of this investigation, there was no probable cause to believe that evidence of criminal activity of any kind was being kept in Andrew Dollard's trash can. (Whisenand Dep. p. 110:20 – p. 111:2). Whisenand could not explain what it was about Andrew Dollard that caused him to be the only non-medical staff member whose home trash was being searched. (Whisenand Dep. p. 111:19 -25).

Whisenand's supervisor, Wichern, obtained and searched through banking records of DORN to see if there was any evidence of "structuring," an obscure financial crime relating to the deposit of cash in banks in a manner intended to prevent the banks from reporting unusually large deposits. No evidence of structuring was found. (Whisenand Dep. p. 161:12-20).

(7) <u>Defendants' Affirmative Defenses</u>

A. <u>Defendants are not entitled to qualified immunity because there was no reasonable belief of probable cause</u>.

When deciding the issue of qualified immunity in connection with a summary judgment motion, the facts must be viewed in the light most favorable to the plaintiff. *Williams v. City of Chicago,* 733 F.3d 749, 758 (7th Cir. 2013)(summary judgment in favor of defendants reversed because, viewing evidence in light most favorable to plaintiff, no room for reasonable mistake by the officers about whether they had probable cause.).

Immunity does not extend if the judicial finding or probable cause was based solely on information the officer knew to be false or should have known was false. In *Tibbett v. McPherson,* 5 F. Supp. 3d 989 (S.D. Ind. 2014), discussed *supra,* Defendants argued that they were entitled to qualified immunity even if the court found that probable cause did not exist. *Id.* This Court acknowledged that the officer was entitled to immunity only if his belief that he had probable cause was objectively reasonable, based upon the facts most favorable to the plaintiff. *Id.* at 994. The facts, taken in the light most favorable to the plaintiff, indicated that the music was not loud enough to be unreasonable, and no officer could reasonably believe it was lawful to arrest plaintiff. *Id.* at 995.

If the law is clearly established, the qualified immunity defense fails, because a reasonable competent public official should know the law governing his conduct. *Davis v. Zirklebach,* 149 F.3d 614, 620 (7th Cir. 1997). The defendant escapes this fate only if he can

prove that, because of extraordinary circumstances, he neither knew nor should have known of the relevant legal standard. *Id.* Reliance on advice of counsel is not inherently extraordinary, "for few things in government are more common that the receipt of legal advice." *Id.* Advice of counsel might support a claim of extraordinary circumstances, but not if it is routine advice. Relevant factors include whether complete information had been provided to the advising attorney, the prominence and competence of the attorney, how soon after the advice the disputed action was taken, and how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was. *Id.*

Defendants cite two cases from other circuits to support their "advice of counsel" defense. The cases do not support the argument under the facts of this case. *See Wadkins v. Arnold,* 214 F.3d 535, 542-43 (4th Cir. 2000)(mere fact that detective acted upon prosecutor's authorization does not automatically cloak him with the shield of qualified immunity. If a reasonable officer should not have applied for the warrants, the officer would not be shielded from liability simply because the warrants were issued.)

In *Dixon v. Wallowa County,* 336 F.3d 1013 (9th Cir. 2003), the defendants in a 1983 action argued that their reliance upon the prosecutor's advice entitled them to qualified immunity. The Court stated that reliance on an attorney's advice is some evidence of good faith, but not conclusive. The Court listed four questions relevant to whether an officer's reliance on advice of counsel was reasonable: "(1) whether the attorney was independent, (2) whether the advice addressed the constitutionality of the proposed action, (3) whether the attorney had all the relevant facts, and (4) whether the advice was sought before or after the officer's action." *Id.* at 1019.

Miksha was selected by the Defendants to be their backup plan, if they could not persuade a federal prosecutor to bring this case. Klein and Whisenand met with the U.S. Attorney's Office in Indianapolis on June 20, 2014. (Design. of Evid., Ex. 9). Klein and Whisenand laid out their case for the federal prosecutors. The federal prosecutors informed Klein and Whisenand that there was no probable cause for prosecution. (Klein Dep. p. 37:22 – p. 38:2). The evidence they had gathered was not enough to constitute a "provable case." (Klein Dep. p. 38:3-13, p. 40:2-5).

Dietz and Whisenand went back a second time to the U.S. Attorney's Office, where Dietz tried to "plea or beg" the U.S. Attorney to bring criminal charges against DORN. (Design. of Evid., Ex. 10). Whisenand made it clear to the U.S. Attorney that he was not interested in the U.S. Attorney's legal advice, but only in an "up or down" on whether he would file the charges. (Design. of Evid., Ex. 11). Whisenand testified that he was going to prosecute DORN regardless of the legal advice he received from the U.S. Attorney, because he already had Miksha available for that purpose. (Whisenand Dep. p. 136:11 – p. 138:19).

Whisenand drafted the Probable Cause Affidavit's substantive provisions. (Miksha Dep. p. 46:19 – p. 47:20). Miksha limited himself to stylistic changes, like reordering the paragraphs, and adding photographs. (Miksha Dep. p. 46:21-24). Miksha acknowledged that he was "instructed" to file charges, and told when to file, by either Dietz or Whisenand. (Miksha Dep. p. 41:3-14). The charges against DORN were to be filed by a "target date" that Wichern (DEA) established months before the investigation concluded. (Dietz Dep. p. 107:11-17).

Miksha was identified as a potential prosecutor by Dietz or Klein, in late 2013. (Miksha Dep. p. 20:12-16). Miksha had never done a drug case involving a doctor before. (Misha Dep. p. 23:19-21). The Hamilton County Prosecutor's Office did have an experienced drug

prosecutor, who had prosecuted doctors' cases.  His name was Jeff Wehmueller.  (Miksha Dep.

p. 23:22 – p. 24:18).  Jeff Wehmueller was also the supervisor of the "screening team" at the

prosecutor's office.  (Miksha Dep. p. 13:5-15).  It was the procedure at the Hamilton County

Prosecutor's Office to submit drug offense cases to the screening team.  (Miksha Dep. p. 12:15 -

p. 13:4).  The screening team is involved in all decisions on whether to prosecute or not

prosecute, except for those cases assigned to the sex crimes prosecutors or the fatal alcohol crash

team prosecutor.  (Miksha Dep. p. 14:11-16).

The DORN case never went to the screening team.  (Miksha Dep. p. 27:7-20, p. 35:11-

13).  Miksha did not even open a file at the prosecutor's office in this matter.  (Miksha Dep. p.

27:5-6).  No file was opened, and no screening was done, because Miksha considered the

investigation to be "clandestine" within the prosecutor's office, and he "didn't want too many

people to know."  (Miksha Dep. p. 45:16 – p. 46:6).

In particular, Miksha made sure that Jeff Wehmueller was never informed of the DORN

investigation.  Because Mr. Wehmueller is active in local politics, and Mr. Dollard had run for

County Council, Miksha "created my own kind of Chinese wall" to keep Mr. Wehmueller

unaware of the investigation.  (Miksha Dep. p. 35:19 – p. 36:8).  Because Mr. Wehmueller was

being intentionally kept uninformed about the DORN prosecution plans, Miksha testified that

"any conversations I had with Jeff relating to this were broad, general questions and not

specifically about individuals involved or anything like that."  (Miksha Dep. p. 36:9-14).

The jury is entitled to conclude that Miksha was never providing legal advice to the

Defendants.  He was only following their instructions about a prosecution that the Defendants

were determined to pursue somewhere.  There is a significant factual issue concerning qualified

immunity.

10. <u>Ley's settlement of the forfeiture action is not an admission of probable cause to arrest or prosecute for crimes</u>.

In *Hudkins v. City of Indianapolis,* 2015 U.S. Dist. LEXIS 103039, Plaintiffs entered into plea agreements. The prosecutor hand wrote "agmt on PC," on each plea agreement and testified that it signified that both agreements "were conditioned on each man's agreement to the existence of probable cause for his arrest." *Id* at *12. The prosecutor further testified that she did not want to dismiss the criminal charges without establishing the existence of probable cause, the admission of guilt, and foreclosing the possibility that either could file a civil action for false arrest, false imprisonment, or malicious prosecution. She testified that she would not have dismissed the criminal charges if plaintiffs had not agreed to the existence of probable cause. *Id.* at *13.

Plaintiffs' criminal lawyer testified that he told his clients that they were not admitting guilt by entering into the agreement. *Id.* at * 10. Plaintiff testified that he signed the plea agreement because he wanted everything to go away. He did not want to come back to the city. He wanted to move on with his life and not have it hanging over his head. *Id.* at *12.

Plaintiffs filed claims for false arrest, and the City moved for summary judgment, arguing "that Plaintiffs' admission of probable cause in signing the Plea Agreements is fatal to their claim…." *Id.* at 24. Judge Barker concluded that the argument was "foreclosed by Seventh Circuit precedent" because judicial estoppel does not apply to a plea agreement. Judicial estoppel provides only that a party who prevails on one ground in a lawsuit may not repudiate that ground in another lawsuit, and the Seventh Circuit holds that a party entering a plea agreement does not "prevail:"

> "Wells could have been acquitted had he gone to trial on the felony charge. Moreover, the State also benefitted from its compromise with Wells, trading the uncertainty of a jury trial for a known

> outcome while conserving prosecutorial resources.  Given the
> compromise nature of this plea agreement, referring to Wells as the
> prevailing party is a bridge too far."

*Id.* at *27 *quoting Wells v. Coker,* 707 F.3d 756, 760-61 (7th Cir. 2013).

11.  Facts and Arguments Unique to Plaintiff George Agapios, M.D.

The criminal charges asserted against Dr. Agapios are set forth on p. 4 of Attachment

"A" to the Affidavit of Probable Cause (Design. of Evid., Ex. 8).  Dr. Agapios was charged with

"Dealing" as a result of writing prescriptions to undercover officers on four occurrences, which

are described in the Probable Cause Affidavits in ¶¶ 114, 121, 127 and 128.  (*See* PCA, Attach.

4, p. 4).

The prosecution theory was that all of the prescriptions written by Dr. Agapios were

invalid, because the initial examination, evaluation, and diagnosis made by Dr. Ley in admitting

the undercover officers as program patients was insufficient to detect that the undercover officers

were lying about their addiction history and symptoms.

In order to establish the required criminal *mens rea,* and to show that Dr. Agapios

"knowingly" prescribed medications to an individual who was not actually an addict in need of

treatment, the prosecution would have to prove that Dr. Agapios knew that Dr. Ley's initial

examination and diagnosis was criminally insufficient.  There is a complete absence of evidence

of this knowledge.

Dr. Agapios worked only two Saturday mornings a month at the Carmel office.  Dr. Ley

was not present in the Carmel office the same day as Dr. Agapios.  (Agapios Dep. p. 25:18 – p.

26:15, p. 45:9-18).  The undercover officers' videotapes confirmed that Dr. Agapios was not

present at the initial examinations, when the undercover officers were admitted into the DORN

program.

Dr. Agapios had a right to assume that Dr. Ley performed a medically sufficient initial patient examination to admit patients to the program, and establish the medically appropriate initial Suboxone dose and taper schedule. (Agapios Dep. p. 60:3-20). That program, including Dr. Agapios' clinics, had been audited by the DEA repeatedly. (Design. of Evid., Ex. 6). Dr. Agapios had no reason to question Dr. Ley's medical decision to admit the UCs into the DORN program.

The Indiana Administrative Code Regulations do not require an independent re-examination and diagnosis before every "program" prescription. In order to make it appear otherwise, Whisenand's Probable Cause Affidavit misrepresented the language of the Indiana Administrative Code, 844 IAC § 5-4-1. The identical misrepresentation of the language of the Rule in the Probable Cause Affidavit was repeated in the Summary Judgment Briefs filed by the United States and by Whisenand in this Court.

Ms. Woods was not attempting to deceive the Court as to the relevant language of the Rule. She obviously presumed that the regulation's language quoted in the Probable Cause Affidavit was accurate, and relied upon it in repeating the falsification in her Briefs. If the U.S. Attorney in this case relied upon, and was misled by, the Probable Cause Affidavit's misrepresentation of the language of applicable Indiana regulations, it is reasonable to assume that the Judge providing the PCA was also misled.

The same Probable Cause Affidavit was presented to the Indiana Medical Licensing Board by the Indiana Attorney General's Office (Jessica Krug) and Whisenand. Dr. Agapios was reprimanded for signing a few prescriptions on the day before he actually delivered them to the patient. None of those occurrences involved the UCs, or the criminal charges filed. Despite the "evidence" of the Probable Cause Affidavit, the Indiana Medical Licensing Board found that Dr.

Agapios had not violated any state or federal laws or regulations in his treatment of the UCs, or any one else in his DORN practice. (Design. of Evid., Exs. 15, 16).

The UCs were accepted by Dr. Ley into the DORN program in good faith, and in a reasonable reliance that the medical history of significant opiate addiction that each of them presented was accurate. Nevertheless, the decision to admit the undercover officers into the DORN detoxification program was solely the decision of Dr. Ley, not Dr. Agapios. There is a complete absence of evidence that Dr. Agapios knowingly wrote Suboxone prescriptions without a legitimate medical purpose.

12. <u>Facts and Arguments Unique to Eric W. Ley</u>.

Eric Ley was an office manager at DORN's Carmel and Kokomo offices. (Eric Ley Dep. p. 23:19 – p. 24:1). He only worked at the clinics, where he did "compliance" work. (Eric Ley Dep. p. 9:12-25). Eric Ley was at the Carmel clinic on Saturday morning twice a month, and at the Kokomo clinic on a Wednesday afternoon once a month. (Eric Ley Dep. p. 27:11: - p. 28:20).

Eric Ley has no medical training or certifications. (Eric Ley Dep. p. 206:11-15). Eric Ley has never seen an initial intake examination and induction. He sat through part of one in 2009, but left before it concluded. (Eric Ley Dep. p. 35:4-20). Eric Ley has no idea how initial patient examinations and inductions were performed at any time after 2009. (Eric Ley Dep. p. 35:23-25). Medical evaluations and examinations of patients always took place outside of the presence of Eric Ley, who had no reason to know what occurred. (Eric Ley Dep. p. 113:2-23).

The criminal charges Defendants asserted against Eric Ley are detailed on p. 11 of Attachment A to the Probable Cause Affidavit (Design. of Evid., Ex. 8). Eric Ley's statement of charges asserts "conspiracy" and "employment at DORN." There is no reference to any specific

act allegedly committed by Eric Ley that was unlawful.  Eric Ley is mentioned a handful of times in the Probable Cause Affidavit paragraphs, but each reference describes him performing only routine clerical and administrative functions.

Eric Ley does not appear in the videos of the initial interviews with any of the undercover officers.  There is no evidence to support the claim that Eric Ley knew what procedures and diagnostic techniques were utilized by Dr. Ley in the admission and induction process.  Eric could not have "known" whether the diagnostic techniques Dr. Ley utilized were medically sufficient or criminally insufficient, if he did not know what they were.

Eric Ley has no medical training.  He has no qualifications that would enable him to "know" whether the diagnostic techniques of a Board Certified Addiction Specialist were medically sound, or so unsound as to imply that prescriptions were written for some non-medical purpose.  Whisenand admitted that because non-medical staff were not medical practitioners, they would not have known whether Suboxone prescriptions were being prescribed without a legitimate medical purpose.  (Whisenand Dep. p. 296:17-23; p. 298:4-11).

Under the Indiana Administrative Code, only the physician prescribing a controlled substance and the pharmacist filling the prescription are responsible for the prescription.  Only the medical professionals are subject to potential criminal penalties associated with the prescription.  Paragraph 4 of the Probable Cause Affidavit identifies the Administrative Code provision establishing the extent of prescription responsibility.  It reads in relevant part as follows:

> 856 IAC 2-6-3 § 3 (a):  . . . The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  . . . And the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for

> violations of the provisions of law relating to controlled
> substances.

Conspicuously absent is the imposition of any duty upon non-medical clerical staff of a doctor's office to independently confirm the medical purpose of the prescription, or risk criminal prosecution.

Whisenand was an experienced drug diversion investigator for the DEA. While not a medical professional, his role at the DEA gave him far greater access to information concerning opioid prescription practices and standards than the non-medical, clerical staff at DORN. Whisenand admitted that he lacked sufficient expertise or knowledge to make the medical determinations that his criminal charges attributed to the DORN non-medical staff.

Whisenand admitted that he did not know what would constitute an appropriate exam for the purpose of diagnosing addiction, because he is not a medical doctor. (Whisenand Dep. p. 24:6-8). He admitted that he did not know what tests would be appropriate, or even if any exist, to verify a patient's subjective complaints of pain, and that he would need to refer that question to a medical expert. (Whisenand Dep. p. 42:11-23). Mr. Whisenand testified that he was incapable of making a judgment concerning the medical propriety of the taper schedules prescribed for the undercover officers, because he is not a trained medical provider. (Whisenand Dep. p. 56:5-8).

Whisenand was aware that Eric Ley had no reason to know what diagnostic procedures were utilized by Dr. Ley in deciding to accept the UCs into the DORN detoxification program. Whisenand was aware that Eric Ley had no medical qualifications, and no DORN job duties, that would have allowed him to determine the sufficiency of Dr. Ley's medical judgments. Even if there had been probable cause to charge Dr. Ley, there is a complete absence of probable cause supporting charges against DORN's non-medical staff, including Eric Ley.

Eric Ley incorporates by reference the Co-Plaintiffs' argument on "Substantial Compliance" with the Indiana Tort Claims Act notice provisions.

### 13. Facts and Argument Unique to Andrew Dollard

Andrew Dollard has a Masters Degree in Criminology that he obtained from Indiana State University in 2003. (Dollard Dep. p. 10:19-25). He graduated from law school in 2010. (Dollard Dep. p. 11:1-5). Before starting law school in 2006, Dollard spent ten years working as a probation officer in Hamilton County. (Dollard Dep. p. 12:9-13, p. 13-2-8).

For eight years, Dollard was active with the Hamilton County Council on Alcohol and Drugs, where he met Dr. Ley. (Dollard Dep. p. 13:9-18). Dollard became the office director of the DORN Noblesville clinic. (Dollard Dep. p. 20:9-12). Dollard's role at the clinic was essentially identical to his former work as a probation officer. He made no medical decisions. (Dollard Dep. p. 251:2-12).

The Noblesville clinic had offices hours on every other Friday. (Dollard Dep. p. 21:2-8). The Noblesville clinic dates are significant, because they contradict claims put in the Probable Cause Affidavit. Paragraph 74 of the Probable Cause Affidavit purports to describe the results of surveillance conducted at the Noblesville office on Friday, January 31, 2014. Paragraph 75 of the Probable Cause Affidavit purports to describe the results of surveillance conducted at the Noblesville office on the following Friday, February 7, 2014. Because the Noblesville office was never open on consecutive Fridays, at least one, if not both, of the probable cause surveillance reports must have been fabricated. (Dollard Dep. p. 48:2-24).

The basis of the criminal charges asserted against Andrew Dollard is set forth on p. 10 of Attachment A of the Probable Cause Affidavit (Design. of Evid., Ex. 8). Like all of the non-medical staff, Dollard was charged with "conspiracy," and with being "employed by or

associated with" DORN.  Paragraphs ¶¶ 111 and 112 of the Probable Cause Affidavit, are alleged to be the factual basis of the claim that on April 25, 2014, Dollard "did knowingly aid Larry J. Ley, M.D." in delivering a prescription for a controlled substance that Dr. Ley had prescribed outside the usual course of professional medical practice.  Paragraphs 111 and 112 of the Probable Cause Affidavit say only that Dollard phoned in a prescription from Dr. Ley to the pharmacy for two of the UCs.

On every occasion upon which Dollard phoned in a prescription to a pharmacy, he did so at the direction of Dr. Ley, following Dr. Ley's instruction as to the information to be relayed to the pharmacist.  (Dollard Dep. p. 54:12 – p. 55:21).  Phoning in a prescription to a pharmacy, under the direction of the doctor issuing the prescription, is neither a criminal act, nor evidence of one, unless the staff member was aware that the prescription itself was invalid and illegal.  (Whisenand Dep. p. 68:12-17).  It is not even unusual, in any doctor's office, for prescriptions to be delivered by non-medical staff members.  (Whisenand Dep. p. 154:3-7).

Andrew Dollard had no knowledge of the diagnostic procedures utilized by Dr. Ley to determine which patients would be admitted to the DORN program.  He never attended an initial patient meeting.  (Dollard Dep. p. 24:9-18).  He was not involved in the induction or stabilization phases of treatment, and was unaware of the clinical guidelines for Suboxone treatments.  (Dollard Dep. p. 251:20 – p. 252:13).

There is not a shred of evidence that Andrew Dollard was aware of the diagnostic procedures utilized by Dr. Ley to determine whether to admit a patient to the DORN detoxification program.  Dollard lacked the medical background necessary to evaluate the sufficiency of the diagnostic procedures utilized by Dr. Ley, if he had known what they were.  Dollard could not have "knowingly" participated in the delivery of prescriptions for Suboxone

without a legitimate medical purpose. He could not have known any Suboxone prescription was "invalid."

Andrew Dollard incorporates by reference the Co-Plaintiffs' argument on "Substantial Compliance" with the Indiana Tort Claims Act notice provisions.

<u>CONCLUSION</u>

The Defendants' Motions for Summary Judgment should be denied. There is a question of fact for the jury as to the existence of "probable cause" to support the arrests and prosecution of each Plaintiff.

Respectfully submitted,

**MILLER & FISHER, LLC**

/s/ James R. Fisher
James R. Fisher

*Attorneys for Larry Ley, George Agapios*
*Andrew Dollard and Eric Ley*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of May 2017, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmquary@btlmlaw.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Douglas C. Haney
CITY OF CARMEL
dhaney@carmel.in.gov

/s/ James R. Fisher
James R. Fisher

James R. Fisher
Debra H. Miller
MILLER & FISHER, LLC
8900 Keystone Crossing, Suite 1080
Indianapolis, Indiana  46240
(317) 536-7570
(317) 536-7579  Fax
fisher@millerfisher.com