| | | |
|---|---|---|
| DEREK S. TISLOW,<br>ANDREW J. DOLLARD,<br>YVONNE S. MORGAN,<br>CASSY L. BRATCHER,<br>JOSEPH A. MACKEY,<br>JESSICA CALLAHAN,<br>ERIC W. LEY, and<br>FELICIA REID, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | 1:16-cv-01721-RLY-MJD |
| GARY WHISENAND,<br>CITY OF CARMEL,<br>AARON DIETZ, and<br>THE UNITED STATES, Acting by and<br>through its Drug Enforcement Administration, | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |
| HAMILTON COUNTY PROSECUTOR'S<br>OFFICE, | )<br>)<br>) | |
| Interested Party. | )<br>) | |

| | | |
|---|---|---|
| LARRY LEY,<br>RONALD VIERK,<br>GEORGE AGAPIOS, and<br>LUELLA BANGURA, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | 1:16-cv-01908-RLY-MJD |
| GARY WHISENAND,<br>CITY OF CARMEL, | )<br>)<br>) | |

1

| | |
|---|---|
| AARON DIETZ, and | ) |
| UNITED STATES, Acting by and through its | ) |
| Drug Enforcement Administration, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| HAMILTON COUNTY PROSECUTOR'S | ) |
| OFFICE, | ) |
| | ) |
| Interested Party. | ) |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

In August of 2013, law enforcement officials began investigating Dr. Larry Ley

and his two addiction treatment companies, Living Life Clean, LLC ("Living Life") and

Drug Opiate Recovery Network, Inc. ("DORN"), after the death of one of his patients.

The investigation uncovered several complaints related to Dr. Ley's treatment and

prescribing of Suboxone, a drug used to treat opiate addictions. The investigation

eventually culminated into twelve separate arrests and a media firestorm. As successful

as the investigation was for law enforcement, the ensuing prosecution was anything but:

several of the charges were dismissed early on and then the state trial court acquitted Dr.

Ley of all charges. In the face of these results, the prosecutor dismissed the remaining

charges against the rest of the defendants.

Now in this court, Dr. Ley and his former staff seek redress for the government's

failed prosecution. They allege law enforcement falsely arrested and maliciously

prosecuted them resulting in the destruction of their careers and reputations. Gary

Whisenand, Aaron Dietz, the City of Carmel, and the United States (collectively

"Defendants") have all moved for summary judgment. As will be explained below,

probable cause supports the warrants used in connection with Plaintiffs' arrests. Defendants therefore are entitled to summary judgment.

## I.     Background

### A.     Dr. Ley and the DORN Clinic

This case primarily concerns Dr. Ley's treatment of opiate addicts. Dr. Ley graduated from medical school in 1971 and has worked in a variety of medical capacities around central Indiana. (Filing No. 184-30, Deposition of Larry Ley ("Ley Dep.") at 9:21 – 10:24).[1] He is board certified in addiction medicine by the American Society of Addiction Medicine. (*Id.* at 12:20 – 13:6; 14:5 – 8). In 2002, he founded Living Life, a company dedicated to treating alcohol abuse. (*Id.* at 14:21 – 24; 15:12 – 15). Dr. Ley operated Living Life out of four offices located throughout central Indiana: Centerville,[2] Noblesville, Muncie, and Kokomo. (*Id.* at 14:9 – 13). Shortly after creating Living Life, Dr. Ley began prescribing Suboxone, which is a drug used to treat opiate addictions. (*Id.* at 15:23 – 25; *see also* Filing No. 184-1, National Drug Intelligence Center Bulletin at 1 – 2).

A few years later, Dr. Ley decided to expand his practice. In 2007, Dr. Ley changed the name of Living Life to DORN. (Ley Dep. at 16:14 – 22). He opened an office in Carmel, Indiana, and he continued operations at the four other satellite offices throughout the state. (*Id.* at 16:13 – 15; 18:11 – 14). Dr. Ley would see all patients for

---

[1] Because of the overlap in evidence, the court cites evidence only from *Tislow et al. v. Whisenand et al.*, No. 1:16-cv-01721-RLY-MJD.
[2] It appears that the Centerville office is sometimes referred to as the Richmond office.

their initial consultation at the Carmel office. (*Id.* at 18:22 – 25). For follow up appointments, patients were then assigned to the office located closest to their home. (*Id.* at 14:14 – 20; 19:1 – 9). Dr. Ley primarily worked at the offices located in Carmel, Noblesville, and Muncie. (*Id.* at 20:23 – 21:3). Other physicians staffed the satellite offices: Dr. Ronald Vierk worked at the Centerville location; Dr. Luella Bangura worked at the Kokomo location; and Dr. George Agapios worked at the Carmel location on Saturdays. (*Id.* at 20:14 – 22).

Several support staff assisted the DORN clinics. Yvonne Morgan assisted at the Muncie and Carmel clinics and directed the Centerville clinic. (Filing No. 159-41, Deposition of Yvonne Morgan at 16:25 – 17:6). She performed clerical work for DORN: answered the phone, conducted drug screens, and handed patients their prescriptions. (*Id.* at 18:4 – 14). Derek Tislow worked at the Noblesville, Carmel, and Kokomo offices. (Filing No. 159-46, Deposition of Derek Tislow at 49:2 – 5). He conducted urine screens, handed out prescriptions, and took cash. (*Id.* at 50:10 – 22). Eric Ley helped manage the Carmel and Kokomo offices. (Filing No. 159-47, Deposition of Eric Ley at 23:24 – 24:4). Felicia Reid assisted at the Kokomo office by seeing patients for their biweekly appointments on Wednesdays, and Joseph Mackey helped by monitoring the crowds in the parking lot. (Filing No. 159-40, Deposition of Felicia Reid at 15:11 – 23; Filing No. 159-42, Deposition of Joseph Mackey at 10:3 – 21). Jessica Callahan managed the Muncie office, and Cassy Bratcher managed the Carmel office. (Filing No. 159-43, Deposition of Jessica Callahan at 13:4 – 12; Filing No. 159-45, Deposition of Cassy Bratcher at 17:21 – 22). Andrew Dollard managed the Noblesville office. (Filing

No. 159-44, Deposition of Andrew Dollard at 20:9 – 12). Part of his tasks included handing out prescriptions even when no doctors were present. (*Id.* at 26:12 – 15).

## B. Controlled Substance Laws

The state of Indiana, like the rest of states, criminalizes dealing in a controlled substance. *See* Ind. Code § 35-48-4-2. Under Indiana law, any "person who: (1) knowingly or intentionally . . . (C) delivers; or (D) finances the delivery of; a controlled substance . . . classified in schedule I, II, or III . . . commits dealing . . . a level 6 felony." *Id.* Buprenorphine, the primary drug component in Suboxone, is a Schedule III drug. Ind. Code § 35-48-2-8(e)(7). Indiana law proscribes unlawful conspiracies and corrupt business influence. *See* Ind. Code § 35-41-5-2 (conspiracy statute); *see* Ind. Code § 35-45-6-2 (RICO statute).

Indiana also limits the prescribing authority of medical practitioners in several ways. Medical practitioners must have a legitimate medical purpose when issuing prescriptions for controlled substances. 856 Ind. Admin. Code 2-6-3(a). They must issue only a quantity that is necessary and must also be acting in the usual course of their professional practice. *Id.* Practitioners that issue prescriptions for controlled substances outside the scope of their professional practice or without a legitimate medical purpose are subject to the state's criminal laws related to controlled substances. *Id.*; *see also Alarcon v. State*, 573 N.E.2d 477, 480 (Ind. Ct. App. 1991) (holding Indiana's dealing statutes apply to licensed physicians who issue unlawful prescriptions). Additionally, physicians may not provide controlled substances to a person whom they have never personally examined or diagnosed subject to a few exceptions. *See* 844 Ind. Admin.

Code 5-4-1(a).  Prescriptions for controlled substances must ordinarily be signed and dated on the day when issued.  856 Ind. Admin. Code 2-6-4(a).

The federal government also regulates a physician's prescribing of controlled substances.  The Drug Addiction Treatment Act of 2000 ("DATA") limits the number of patients a physician may treat with buprenorphine for addiction.  *See* Drug Addiction Treatment Act of 2000, Pub. L. No. 106-310, 114 Stat. 1222 (codified in 21 U.S.C. § 823(g)).  During the relevant time frame, newly certified providers could treat thirty patients, and after one year, providers could treat up to one-hundred patients.  *Id.*; *see also* Alan Gordon & Alexandra A. Gordon, *Does it Fit?—A Look at Addiction, Buprenorphine, and the Legislation Trying to Make It Work*, 12 J. HEALTH & BIOMEDICAL L. 1, 15 – 17 (2016) (discussing DATA's physician requirements and regulations).  The cap only applies to addiction patients: those being treated for an off-label use, such as pain, are not counted towards the one-hundred patient limit.  (*See* Filing No. 153-2, Probable Cause Affidavit ("PC Aff.") at ¶ 25(b); *see also* Ley Dep. 26:10 – 17; 51:6 – 52:3).

### C.     The Investigation

In August of 2013, the Madison County Deputy Coroner contacted the Carmel Police Department to discuss the death of one of Dr. Ley's patients.  (Filing No. 159-35, Deposition of Sergeant Marc Klein ("Klein Dep.") at 15:19 – 21).  The Coroner informed Sergeant Marc Klein that the Deceased's family expressed concerns about the care that Dr. Ley provided to the Deceased.  (Klein Dep. at 16:5 – 17; *see also* Filing No. 159-37, Deposition of Gary Whisenand ("Whisenand Dep.") at 18:5 – 17).  The Madison County

Deputy Coroner also contacted Adam Deitz regarding the death.  (Filing No. 159-36, Deposition of Adam Deitz ("Deitz Dep.") at 13:20 – 14:7).  At the time, Deitz oversaw special investigations and worked as the director of the Hamilton/Boone County Drug Task Force.  (*Id.* at 9:17 – 20).

Both Deitz and Klein began investigating Dr. Ley and DORN based on the information from the Deceased's family.  Deitz coordinated information between Carmel Police Department and the Drug Enforcement Administration ("DEA").  (*Id.* at 15:1 – 4).  Eventually, Sergeant Klein and DEA Agent Dan Gillen scheduled an interview with the Deceased's family.  (*Id.* at 17:9 – 16).

The family explained that the Deceased had gone to Dr. Ley's office for six years to try and get help for his addiction problems.  (*Id.* at 19:2 – 6).  The family further explained that they had some concerns with Dr. Ley's treatment of the Deceased: he rarely went into the office, he wasn't being seen by Dr. Ley, other family members would pick up prescriptions for him, and he always paid in cash.  (*Id.* at 20:1 – 7).

Around the same time as the interview, DEA began receiving complaints about DORN's practice.  The complaints focused on the lack of medical care provided to patients and the ease with which patients could receive prescriptions for Suboxone without being seen by a DORN physician.  (Filing No. 159-2, Nov. 15, 2013 Report of Investigation ("ROI") at 1).  Based on the interview and complaints, on November 15, 2013, DEA opened an investigation into Dr. Ley and DORN.  (*Id.*).  The case was assigned to Gary Whisenand, a diversion investigator within DEA.  (Whisenand Dep. at 25:18 – 23).

Whisenand began investigating past complaints about DORN from practitioners, pharmacists, and former patients. (*See* Filing No. 159-3, Nov. 26, 2013 ROI at 1; *see also* Filing No. 159-6, Dec. 2, 2013 ROI). Many, if not all, of the complaints criticized Dr. Ley and DORN for not providing any medical treatment and simply writing prescriptions for Suboxone. (*See* Nov. 26, 2013 ROI at 1 – 4). One complaint alleged that Dr. Ley and DORN prescribed Suboxone without a full medical evaluation:

> [Patient Jane Doe] claimed that on her initial visit, she and a few others received a few papers and a 15-minute group lecture from Dr. Ley. During the lecture, Ley asked each person what drug they were currently abusing. After paying $300 cash, Dr. Ley issued [Doe] a Suboxone prescription. Per [Doe], Ley did not conduct an exam nor was a urinalysis administered. Afterwards, [Doe] was scheduled to go to the DORN clinic in Centerville, Indiana, for a refill. [Doe] wrote "I think Dr. Ley should not be prescribing Suboxone! I would like to have the $300 back that I had to pay for him to do nothing more than give me a prescription."

(*Id.* at 3 (citing Indiana Attorney General Consumer Complaint Form date 12/14/11).

Physicians too expressed concern about Dr. Ley's practice:

> The physicians expressed concern to Investigators about the lack of medical care that Dr. Ley appeared to provide to addiction treatment patients. One physician noted that Dr. Ley operated carelessly as he did not usually conduct in-person follow-up visits with his chemically dependent patients. Another physician associated Dr. Ley with not providing adequate patient care and being more focused on profits rather than his patient's well-being.

(*Id.* at 1).

Several complaints also targeted Dr. Ley's satellite offices and the other practitioners. (*See e.g.* Filing No. 159-4, Dec. 18, 2013 ROI at 1). For example, law enforcement interviewed several Walgreen's pharmacists practicing in Kokomo, Indiana and heard similar complaints about DORN:

Pharmacists advised that a large number of Suboxone prescriptions originated from Dr. Ley's Kokomo practice every other Wednesday night. Per [p]harmacist[]s, on Wednesday nights, people "were lined up down the street" to obtain their prescriptions. Additionally, Walgreen's pharmacists had received the following complaints from patients about the practice:

> a) patients wait up to [90 minutes] to see the doctor.
> b) Patients were given a prescription but not evaluated medically.
> c) Buprenorphine or Suboxone prescriptions were being written for "chronic pain."
> d) Only cash was accepted at the practice.
> e) Unlike most practices, this medical practice was only open during the evening.

(Filing No. 159-4, Dec. 18, 2013 ROI at 1). Whisenand's review included a complaint from a Kokomo police officer who had worked security for DORN at the Kokomo office:

> Officer VanCamp stated that he never saw Dr. Ley at the Kokomo practice, only a female provider. Officer VanCamp further stated that there were "hundreds" of patients and all night long there was a line of up to 100 people waiting. Officer VanCamp believed he was hired for security to prevent robberies due to the business being cash only and to deal with disgruntled patients. After his first night of working security, Officer VanCamp stated he felt the practice was "sketchy" and opted to no longer work security for this practice.

(*Id.* at 2).

These complaints led Whisenand to conduct research on INSPECT, Indiana's Prescription Monitoring Program. (*See* Filing No. 159-7, Dec. 9, 2013 ROI). INSPECT is an online database that allows law enforcement to monitor the prescribing of controlled substances. *See generally Lundy v. State*, 26 N.E.3d 656, 658 – 59 (Ind. Ct. App. 2015) (describing INSPECT more thoroughly). INSPECT revealed that each DORN physician issued a high number of Suboxone prescriptions in the years 2011, 2012, and 2013. (*See* Dec. 9, 2013 ROI (Dr. Ley)); Filing No. 159-8, Jan. 14, 2014 ROI (Dr. Agapios)); Filing

No. 159-9, Jan. 23, 2014 ROI (Dr. Vierk)); Filing No. 159-10, January 27, 2014 ROI (Dr.

Bangura)).

Part of the investigation also involved patient interviews and DEA-authorized

surveillance of all four DORN offices.  (PC Aff. ¶¶ 24, 39).   On Dec. 16, 2013, a DEA

task force officer interviewed a current DORN patient who described the environment at

the Kokomo clinic:

> [Patient] informed the TFO that he has been a DORN patient for the past
> three years and that patients at the Kokomo office were coming from as far
> away as South Bend, Indiana. [Patient] stated that (sic) were major issues at
> the Kokomo office with people in the parking lot conducting drug deals and
> discussing how they were going to sell their medications. Additionally,
> [Patient] stated that patients were not being seen by the doctor at the Kokomo
> practice. [Patient] identified Dr. Bangura as the Kokomo doctor and claimed
> that he had only been seen by her one time in a year.  Per [Patient], once
> inside the office, patients paid $80, obtained their prescriptions from an old
> lady at the front desk, and "you are pushed out the door." According to
> [Patient], prescriptions were pre-signed by either Dr. Bangura or Dr. Ley.

(PC Aff. ¶ 24).  Some former patients expressed similar concerns, explaining that no

exams or tests were performed at the clinics.  (PC Aff. ¶¶ 28, 29, 30).  DEA Surveillance

of all four clinics confirmed many of these allegations.  (*See* PC Aff. ¶¶ 39, 42, 43, 49,

59, 74, 75, 76).

### D.   Undercover Officers and Arrests

Whisenand decided to enlist the help of undercover officers upon the

recommendation of Andre Miksha, one of the state prosecutors.  (Filing No. 184-28,

Deposition of Andre Miksha ("Miksha Dep.") at 30:10 – 31:3).  Miksha felt that a

firsthand account from inside was needed in order to prosecute the case.  (*See id.*).  On

February 13, 2014, DEA obtained an order from Magistrate Judge Tim Baker of the

United States District Court for the Southern District of Indiana authorizing the use of undercover agents.  (*See* Filing No. 159-13, Application and Order for Use of Undercover Agents).

On March 25, 2014, two DEA special agents posed as new patients at the Carmel office.  (PC Aff. ¶ 104; *see also* Filing No. 159-30, Ex. B, Undercover Videos, 3/25/14 video).  Cassy Bratcher, the office director, greeted the agents and told them to complete some paperwork.  (*See* 3/25/14 video).  She then directed the agents into a conference room.  (*Id.*).  Dr. Ley entered the room and discussed addiction treatment for about an hour.  (*See id.*; *see also* PC Aff. ¶ 104).  During the next hour, Dr. Ley questioned the patients in front of one another, asking what types of drugs they were taking, what doses they were taking, and whether they had any conditions causing pain.  (*See* 3/25/14 video).  At the end of the second hour, Dr. Ley prescribed Suboxone for "chronic pain/pain management" and directed the agents to the front to pick up their prescription.  (PC Aff. ¶ 104).  The clinic charged the agents three-hundred dollars ($300) for the office visit and prescription.  (*Id.*).  Dr. Ley also gave them the contact number for "Andrew" and assigned the agents to the Noblesville office for future appointments.  (*Id.*).

The use of undercover agents for initial visits continued at the Carmel clinic, and the reports were the same: Dr. Ley conducted a two-hour group discussion; he did not conduct a physical exam or a comprehensive interview of any patient; and each patient left the clinic with a prescription of Suboxone after paying three-hundred dollars.  (*Id.* ¶¶ 105, 106, and 107).

The undercover agents then reported to the various clinics for follow up appointments and corroborated many of the earlier findings in the investigation. The appointments generally spanned a very short time. (*Id.* ¶ 108 (Centerville - four minutes and forty-five seconds); ¶ 109 (Kokomo - thirteen minutes); ¶ 111 (Noblesville - four minutes); ¶ 114 (Carmel - under two minutes); ¶ 117 (Muncie - four minutes)). The agents received another prescription of Suboxone without being evaluated by a doctor. (*E.g. id.* ¶ 109). Many prescriptions had been pre-signed, and no doctors were present at the facility. (*E.g. id.* ¶ 108). The reasons for an additional prescription often changed without explanation—for example, one agent received a prescription of Suboxone for "dependency" even though his initial prescription was for "pain management". (*E.g. id.* at ¶ 116). Other than a urine screening, no physical exam was ever conducted. (*E.g. id.*).

DEA retained two medical doctors to give their opinions on Dr. Ley and DORN. (Whisenand Dep. 289:25 – 290:10; 293:16 – 24; *see also* PC Aff. ¶¶ 137 – 144). Dr. Tim E. King, a pain expert and practicing anesthesiologist, opined that it was unrealistic for a doctor to treat 80-100 patients in a three-hour period, and he stated it was highly unconventional to assume that one doctor could perform an initial pain or addiction evaluation and then assign the patient to another doctor for exclusive Suboxone treatment. (PC Aff. ¶ 139). Upon reviewing the tapes, Dr. King explained that the clinic was run as a "pill mill" and the controlled substances were not issued for a legitimate purpose or in the usual course of practice. (PC Aff. ¶ 140). Dr. R. Andrew Chambers, an associate professor of psychiatry at the Indiana University School of Medicine and practicing addiction treatment doctor, echoed Dr. King's opinions, saying it is unusual to

treat that volume of patients in that amount of time, and it was not normal for one doctor to conduct an initial evaluation and then "farm out" the subsequent ones. (PC Aff. ¶ 143). He too opined that the DORN clinic was an illegal dealing operation and stated that the physicians involved had "conspired to use their professional authorities and reputations, and the cover of medical practice an authority, to maximize financial gains at the expense of clinical standards." (*Id.* ¶ 144).

Whisenand prepared a probable cause affidavit for all DORN staff. (Filing No. 159-1, Whisenand Declaration at ¶ 14). Whisenand filed the affidavit in Hamilton County and Howard County. (*Id.*). Prosecutors reviewed the affidavit and agreed the affidavit supported charges against all DORN employees. (Miksha Dep. 72:4 – 13; 73:8 – 25). Both Judges from Hamilton Superior Court and Howard Superior Court examined the affidavit and found that probable cause existed to charge all DORN employees with conspiracy to commit dealing in a controlled substance and corrupt business influence. (*See* PC Aff. at 57, Attachment A, Summary of Individual Criminal Liability; *see e.g.* Filing No. 159-22, Order Finding Probable Cause as to Larry Ley).[3] Law enforcement arrested Plaintiffs on July 24, 2014. (Whisenand Dec. ¶ 14).

### E.    Post-Arrest Proceedings

Each Plaintiff filed a motion to dismiss the charges, arguing that the evidence was insufficient as a matter of law. The results varied. The Howard Superior Court denied

---

[3] The court has only cited to one order here. The other orders for each individual Plaintiff can be found at Filing Nos. 159-23 (Vierk), -24 (Bangura), -25 (Agapios), -51 (Mackey), -52 (Callahan), -53 (Dollard), -54 (Eric Ley), -55 (Morgan) -56 (Tislow), -57 (Reid), and -58 (Bratcher).

Mackey's motion to dismiss. (*See e.g.* Filing No. 159-51, Order Denying Motion to Dismiss at 4 – 9). The Hamilton Superior Court granted the non-physicians' motions to dismiss but denied the physician's motions to dismiss. (Miksha Dep. 89:15 – 91:7). The Wayne Superior Court granted Morgan's motion to dismiss—a decision that the Indiana Court of Appeals ultimately reversed. *State v. Y.M.*, 60 N.E.3d 1121, 1128 (Ind. Ct. App. 2016).

The state then proceeded to a bench trial against Dr. Ley. After denying a Rule 41 motion for insufficiency of evidence, the court ultimately acquitted Dr. Ley of all charges. (Ley Dep. 189:24 – 190:1). The court found that the State had not shown a knowing and intentional violation of a standard of professional conduct, and so the state had failed to prove beyond a reasonable doubt that the prescriptions were issued outside the usual course of professional medical procedure. (Filing No. 182-8, Trial Transcript at 1373:14 – 24). After Dr. Ley was acquitted, the prosecutors dismissed the rest of the charges. (Miksha Dep. at 100:13 – 19).

The plaintiffs then all filed suit in this court. The physicians are the plaintiffs in *Ley et al. v. Whisenand et al.*, 1:16-cv-01908-RLY-MJD; and the non-physician employees are the plaintiffs in *Tislow et al. v. Whisenand et al.*, 1:16-cv-01721-RLY-MJD. Plaintiffs Vierk, Bangura (physicians), Tislow, Morgan, Bratcher, Mackey, Callahan, and Reid (non-physicians) (collectively the "Vierk Plaintiffs") bring federal claims of false arrest, malicious prosecution, and civil conspiracy against Defendants. Plaintiffs Ley, Agapios (physicians), Eric Ley, and Dollard (non-physicians) bring

federal claims of false arrest, malicious prosecution, civil conspiracy, and municipal liability under *Monell* as well as state law claims for false arrest and conspiracy.[4]

## II.    Legal Standard

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The court reviews the evidence and draws all reasonable inferences from it in the light most favorable to the non-moving party.  *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1110 (7th Cir. 1997) (citation omitted).  Irrelevant factual disputes do not preclude an entry of summary judgment in favor of the moving party.  *Id.*

## III.    Discussion

Before going further, a little housekeeping is in order.  The Vierk Plaintiffs agree to the dismissal of any claims purportedly brought under the Fifth or Fourteenth Amendment.  (*See* Filing No. 181, Vierk Plaintiffs' Response Brief at 57).[5]  They also do not assert any conspiracy claim under Section 1983, *Brady* claim or *Monell* claim.  (*Id.*).  Accordingly, the Vierk Plaintiffs' remaining claims are (1) false arrest and malicious prosecution against Whisenand, the United States, and Dietz; (2) false arrest, false imprisonment, and malicious prosecution against the City of Carmel under Indiana law; and conspiracy under 42 U.S.C. § 1985 against all Defendants.  (*See* Filing No. 148, Vierk Plaintiffs' Statement of Claims).

---

[4] There are two groups of plaintiffs within each case represented by different counsel.  The different groups of plaintiffs appear to have different claims despite the existence of a consolidated amended complaint.

[5] An almost identical brief was filed in 1:16-cv-1908.  (Filing No. 177).

With respect to the Ley Plaintiffs, their claims are less clear. Defendants are entitled to judgment on any *Monell* claim.[6] The same goes for any due process claims under the Fifth and Fourteenth Amendments.[7] Therefore, the court can discern only the following remaining claims: (1) false arrest and malicious prosecution against the United States, (2) false arrest, false imprisonment, and malicious prosecution against the City of Carmel, and (3) false arrest, malicious prosecution, and conspiracy against Dietz and Whisenand. (*See* Filing No. 147, Ley Plaintiffs' Statement of Claims).[8]

Turning to the merits, probable cause is an absolute defense under federal and state law to claims of false arrest, false imprisonment, and malicious prosecution. Law enforcement had probable cause to arrest and charge all twelve plaintiffs under Indiana law. Even in the absence of probable cause, the individual officers had "arguable probable cause," and so they are entitled to qualified immunity.

---

[6] The complaint and statement of claims make no mention of a *Monell* claim, and the allegations in the complaint are not consistent with a *Monell* theory. *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 800 (7th Cir. 2018) (noting a plaintiff is required under Rule 8 to include enough to give defendants fair notice of the claims). Even if a *Monell* claim was pled, the Ley Plaintiffs forfeited any argument by failing to develop it more than two short paragraphs in their brief. *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 612 (7th Cir. 2017).

[7] The Ley plaintiffs did not respond to Whisenand's arguments for dismissal, and they did not develop any argument in support of these claims. *Haley*, 863 F.3d at 612.

[8] To the extent that the Ley Plaintiffs sought to pursue other claims, those are forfeited for failing to clearly develop them.

## A.    There was Probable Cause to Arrest Plaintiffs

A warrant ordinarily shields officers from liability for an illegal arrest. *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985). However, "a warrant does not erect an impenetrable barrier to impeachment of a warrant affidavit." *Id.* (citing *Franks v. Delaware*, 438 U.S. 154 (1977)). An officer who lies or makes materially false representations in the warrant request violates the Fourth Amendment if probable cause would not have been otherwise established. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). Likewise, an officer who intentionally or recklessly withholds material information from a probable cause affidavit violates the Fourth Amendment. *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019) (citation omitted). Where, as here, the plaintiffs allege the affidavit contained false statements and omitted material information, the court must "eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting "hypothetical" affidavit would establish probable cause." *Betker*, 692 F.3d at 862 (citations omitted).

Probable cause exists when the facts and circumstances known to law enforcement "'are sufficient to warrant a prudent person in believing that the suspect had committed' an offense." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)); *see also Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). The bar for probable cause is low: all that is required is a fair probability that a suspect has committed a crime. *Id.* (explaining probable cause requires more than bare suspicion but there need not be evidence sufficient to support a conviction or even a showing that the officer's belief is more likely true than false); *Fox*

*v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (noting it does not take much to establish probable cause); *see also United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017).

The test is an objective one: an officer's motives or subjective intentions do not matter. *Mustafa*, 442 F.3d at 547 (citation omitted); *see also Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir. 1993) ("Even malicious motives will not support a claim of false arrest if probable cause exists."). Only those facts that the officers knew or reasonably believed at the time of the arrest factor into the equation. *See Mustafa*, 442 F.3d at 547. When the underlying facts are not disputed, the existence (or absence) of probable cause is a question of law for the court. *Potts*, 121 F.3d at 1112.

Probable cause is an absolute defense to claims of false arrest, false imprisonment, and malicious prosecution. *Mustafa*, 442 F.3d at 547 (citing *Potts*, 121 F.3d at 1113); *Ali v. Alliance Home Health Care, LLC*, 53 N.E.3d 420, 431 – 33 (Ind. Ct. App. 2016) (same under Indiana law).

The affidavit more than establishes probable cause. It is undisputed that one of Dr. Ley's patients died, and the wife of the Deceased expressed concerns about Dr. Ley's treatments. (PC Aff. ¶ 20). Other addiction doctors expressed concerns too: one said that Dr. Ley was prescribing suboxone "for pain" because the off-label use allowed him to skirt the one-hundred patient limit set by DATA, and another expressed concern that the practice was set up for cash, not for medical treatment. (PC Aff. ¶¶ 25 – 27). At least one pharmacy refused to fill prescriptions from DORN, and former patients explained that they were able to get a Suboxone prescription by paying $300 cash without any medical exam whatsoever. (PC Aff. ¶¶ 21, 30, 31). INSPECT records showed DORN

physicians prescribed an unusually high amount of Suboxone and correspondingly earned a high amount of income from those prescriptions. (*See e.g.* PC Aff. ¶ 38). Two retained doctors expressed the opinion that the Suboxone prescriptions were not issued for a legitimate medical purpose nor were they issued in the usual course of a medical practice. (PC Aff. ¶¶ 140, 144).

Plaintiffs likewise do not seriously dispute the undercover surveillance or the numerous observations about the practice: patients were seen for an initial interview in a conference room for two hours and then received a Suboxone prescription for three-hundred dollars. No physical examination was conducted, and all prescriptions were paid for in cash. At follow-up appointments, patients obtained a Suboxone prescription without ever seeing or being examined by a doctor—some appointments lasting as few as two to four minutes. DORN support staff handed out prescriptions at times when no doctor was present; the physicians had pre-signed many of these prescriptions.[9]

All this combined would warrant a reasonable person standing in the officers' shoes to believe that DORN and its employees prescribed Suboxone without a legitimate medical purpose and outside the usual course of the professional practice. *See* 856 Ind. Admin. Code 2-6-3(a). And that is all that is needed. Law enforcement do not need a foolproof or absolute belief—just a reasonable one. Considering the evidence, it was reasonable for law enforcement to conclude that the prescriptions were not "valid" and

---

[9] Of course, Plaintiffs dispute the *significance* of these facts, i.e. whether they amount to a crime. But there is no genuine dispute as to what happened.

DORN and its employees were conspiring to deal a controlled substance in violation of Indiana law.  *See* Ind. Code § 35-48-4-2; *Alarcon*, 573 N.E.2d at 480.

Plaintiffs put forward several arguments to show probable cause does not exist. First, they argue they were actually providing good medical care, and the prescriptions were issued with a legitimate medical purpose.  (*See* Vierk Plaintiffs' Response at 27 – 34; Filing No. 183, Ley Plaintiffs' Response Brief at 37 – 40).  For example, they argue DORN patients were required to fill out medication and drug-pain histories, doctors do not necessarily have to perform physical examinations when treating addiction patients, each patient was provided an appropriate dose of Suboxone and corresponding tapering schedule, and all the undercovers signed paperwork, promising to attend counseling.  But that evidence goes towards their *defense*, not the lack of probable cause.  *See Alarcon*, 573 N.E.2d at 480 (citing *Tobias v. State*, 479 N.E.2d 508 (Ind. 1985)) ("[T]he writing of a valid prescription by a licensed physician is an absolute *defense* to a charge of dealing in a controlled substance.") (emphasis added); *Spiegel v. Cortese*, 196 F.3d 717, 724 (1999) ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established.").  Plaintiffs' guilt or innocence is not the relevant issue before the court— probable cause is—and that evidence does not negate the presence of probable cause established by the other facts.  *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (noting alternative explanations are often helpful but do not necessarily negate probable cause); *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) ("Subsequent evidence of guilt cannot validate the probable cause determination, nor can evidence of

innocence invalidate it."); *United States v. Osborn*, 120 F.3d 59, 62 – 63 (7th Cir. 1997) (noting the validity of an arrest does not depend on whether the suspect actually committed the crime).

Second, Plaintiffs argue the affidavit includes a laundry list of allegedly "false" statements.[10] (*See* Vierk Plaintiffs' Response Brief at 34 – 37; Ley Plaintiffs' Response Brief at 31 – 36). For example, the affidavit repeatedly explains that many undercover officers "received a Suboxone prescription . . . in exchange for $80.00 [or $300] cash." (PC Aff. ¶ 109(a)). Plaintiffs argue that statement is false because the fee structure was three-hundred dollars for initial entry into the program, and then forty-dollars per week for continued treatment, not per prescription. However, that statement and the rest of those cited by Plaintiffs are not false—just characterizations with which Plaintiffs disagree. Officers are not expected to be legal technicians. The evidence supports Whisenand's characterizations, and so, they are not materially false, even if Plaintiffs were able to explain otherwise at trial. *Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 597 (7th Cir. 2009) (holding statements were not materially false when they were supported by an ample basis).

---

[10] Many of these "false" statements are not actually false when considered in context. For example, Plaintiffs argue "Mr. Whisenand admitted that the claims that Dr. Ley did not interview the undercover officers as part of their initial visit were false." (Ley Plaintiffs' Brief at 34). However, Whisenand stated that under his definition of "interview," no patients were interviewed because there was no one-on-one private exchange as in other medical practices. He agreed that under Plaintiffs' counsel's definition—sitting down with a group and answering questions—the patients were interviewed. (Whisenand Dep. 97:2 – 100:21). This sort of disagreement over semantics is hardly a "false statement," especially when considering probable cause is based on the totality of the affidavit, not a line-by-line, hypertechnical interpretation. *See Brown*, 857 F.3d at 339.

Third, Plaintiffs argue that Whisenand omitted several pieces of important information that would have changed the probable cause calculus. (Vierk Plaintiffs' Brief at 35 – 40; Ley Plaintiffs' Briefs at 36 – 38). For example, Whisenand did not include the fact that DEA presented the case to the federal prosecutors, and they declined to prosecute saying it was not a "provable" case. Whisenand also failed to include, as Plaintiffs argue, that DORN screened all undercover officers at follow up appointments, and even kicked several out who did not follow the terms of the program. But these omissions—even if true—do not negate the presence of the probable cause. The patient complaints, professional complaints, undercover video and surveillance, and expert opinions were sufficient to establish probable cause. *Spiegel*, 196 F.3d at 724.[11]

Lastly, the nonphysicians argue the officers lacked probable cause as to them because they could not have known that DORN physicians were prescribing outside the course of their professional practice. But their knowledge is a question of fact for a jury, not for the officers to determine. *Spiegel*, 196 F.3d at 724; *Y.M.*, 60 N.E.3d at 1126 (reversing trial court's dismissal of charges against nonphysician in this case because nonphysician's knowledge is a question for the jury). The affidavit sufficiently describes

---

[11] Plaintiffs' list of alleged omissions is problematic for other reasons too. Many of the omissions relate to law enforcement's motivations for investigating and prosecuting Plaintiffs. For example, Plaintiffs argue Miksha explained in a memo to Whisenand that the goal was to F**k DORN. (Ley Plaintiffs' Brief at 51). Putting aside the fact that Miksha is not a defendant, the subjective motivations of law enforcement are not relevant to whether probable cause exists. *Mustafa*, 442 F.3d at 547. Other omissions relate to the good treatment provided by DORN, which, for reasons already explained, is relevant to Plaintiffs' *defense*, not the absence of probable cause. *Spiegel*, 196 F.3d at 724 – 25. Lastly, Plaintiffs allege that the two experts are not credible, but credibility is a matter for a jury to resolve, not law enforcement. *Id.* at 725 ("The credibility of a putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial.") (citation omitted).

acts as to each nonphysician that, when accompanied with the requisite knowledge, could support a conviction, much less a finding of probable cause. (PC Aff. at 63 – 70); *see also Y.M.*, 60 N.E.3d at 1126. Accordingly, the nonphysicians' separate arguments are equally unpersuasive.

### B. Even in the Absence of Probable Cause, Dietz and Whisenand are Entitled to Qualified Immunity

The doctrine of qualified immunity protects law enforcement officers who make reasonable mistakes. *See Mustafa*, 442 F.3d at 548. Qualified immunity applies unless the plaintiff can show the officer violated a federal statutory or constitutional right, and that right was clearly established at the time of the incident. *Kisela v. Hughes*, 138 S. Ct. 1148, 1156 (2018); *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012). In the context of a wrongful arrest, a right is not clearly established if law enforcement had "arguable probable cause" to arrest the plaintiff. *Id.*; *see also Rainsberger*, 913 F.3d at 652. "Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." *McComas*, 673 F.3d at 725 (citation omitted); *Fox*, 600 F.3d at 833 (noting qualified immunity applies to government officials who reasonably but mistakenly conclude probable cause exists to make an arrest).

Even if probable cause did not exist, the officers had "arguable probable cause" to arrest Plaintiffs. The *Alarcon* court held that a physician who prescribes controlled substances without any legitimate medical purpose may be criminally liable. *Alarcon*, 573 N.E.2d at 481; *see also Y.M.*, 60 N.E.3d at 1125. For reasons already explained

above, the officers reasonably concluded DORN prescribed Suboxone without any legitimate medical purpose, even if that belief was ultimately mistaken. Whisenand and Dietz are therefore entitled to qualified immunity.

### C.    Plaintiffs Conspiracy Claims Fail as a Matter of Law

Because law enforcement had probable cause to arrest Plaintiffs for conspiracy to deal controlled substances, Plaintiffs' claims for civil conspiracy under Sections 1983 and 1985 fail as a matter of law. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (holding conspiracy claims fail as a matter of law where the officers had probable cause to arrest the plaintiff). The Vierk Plaintiffs' claims under Section 1985 also fail because there is no evidence of any racial or actionable class-based animus. *See Munson v. Friske*, 754 F.2d 683, 694 – 96 (7th Cir. 1985).

## IV.    Conclusion

For the reasons stated above, Defendants' motions for summary judgment are **GRANTED**. With respect to case number 1:16-cv-01721-RLY-MJD, Dietz and the City of Carmel's motion (Filing No. 151) is **GRANTED**, Whisenand's motion (Filing No. 159) is **GRANTED**, and the United States' motion (Filing No. 162) is **GRANTED**. The motion to strike (Filing No. 200) is **DENIED as MOOT**.

With respect to case number 1:16-cv-01908-RLY-MJD, Dietz and the City of Carmel's motion (Filing No. 148) is **GRANTED**, Whisenand's motion (Filing No. 154) is **GRANTED**, and the United States' motion (Filing No. 157) is **GRANTED**. The

motion to strike (Filing No. 198) is **DENIED AS MOOT**. Final judgment shall issue by separate order.

**SO ORDERED** this 8th day of March 2019.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.